(Slip Opinion)　　　OCTOBER TERM, 2009　　　1

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is
being done in connection with this case, at the time the opinion is issued.
The syllabus constitutes no part of the opinion of the Court but has been
prepared by the Reporter of Decisions for the convenience of the reader.
See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SALAZAR, SECRETARY OF THE INTERIOR, ET AL. *v.* BUONO

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 08–472.　Argued October 7, 2009—Decided April 28, 2010

In 1934, members of the Veterans of Foreign Wars (VFW) placed a
Latin cross on federal land in the Mojave National Preserve (Pre-
serve) to honor American soldiers who died in World War I. Claiming
to be offended by a religious symbol's presence on federal land, re-
spondent Buono, a regular visitor to the Preserve, filed this suit al-
leging a violation of the First Amendment's Establishment Clause
and seeking an injunction requiring the Government to remove the
cross. In the litigation's first stage *(Buono I)*, the District Court
found that Buono had standing to sue and, concluding that the pres-
ence of the cross on federal land conveyed an impression of govern-
mental endorsement of religion, see *Lemon* v. *Kurtzman*, 403 U. S.
602, 612–613, it granted Buono's requested injunctive relief (2002 in-
junction). The District Court did not consider whether the Govern-
ment's actions regarding the cross had a secular purpose or caused
entanglement with religion. While the Government's appeal was
pending, Congress passed the Department of Defense Appropriations
Act, 2004, §8121(a) of which directed the Secretary of the Interior to
transfer the cross and the land on which it stands to the VFW in ex-
change for privately owned land elsewhere in the Preserve (land-
transfer statute). Affirming the District Court's judgment both as to
standing and on the merits, the Ninth Circuit declined to address the
statute's effect on Buono's suit or the statute's constitutionality
*(Buono II)*. Because the Government did not seek review by this
Court, the Court of Appeals' judgment became final. Buono then re-
turned to the District Court seeking injunctive relief against the land
transfer, either through enforcement or modification of the 2002 in-
junction. In 2005, that court rejected the Government's claim that

the transfer was a bona fide attempt to comply with the injunction, concluding, instead, that it was actually an invalid attempt to keep the cross on display. The court granted Buono's motion to enforce the 2002 injunction; denied as moot his motion to amend it; and permanently enjoined the Government from implementing the land-transfer statute *(Buono III)*. The Ninth Circuit again affirmed, largely following the District Court's reasoning.

*Held:* The judgment is reversed, and the case is remanded.

502 F. 3d 1069 and 527 F. 3d 758, reversed and remanded.

JUSTICE KENNEDY, joined in full by THE CHIEF JUSTICE and in part by JUSTICE ALITO, concluded:

1. Buono has standing to maintain this action. Whatever the validity of the Government's argument that Buono's asserted injury—offense at a religious symbol's presence on federal land—is not personal to him and so does not confer Article III standing, that argument is not available at this stage of the litigation. The District Court rejected the argument in *Buono I,* the Ninth Circuit affirmed in *Buono II,* and the Court of Appeals' judgment became final and unreviewable upon the expiration of the 90-day deadline for filing a certiorari petition, 28 U. S. C. §2101(c). Moreover, Buono had standing in *Buono III* to seek application of the injunction against the land-transfer statute. A party that obtains a judgment in its favor acquires a "judicially cognizable" interest in ensuring compliance with that judgment. See *Allen* v. *Wright*, 468 U. S. 737. Buono's entitlement to an injunction having been established in *Buono I* and *II*, he sought in *Buono III* to prevent the Government from frustrating or evading that injunction. His interests in doing so were sufficiently personal and concrete to support his standing, given the rights he obtained under the earlier decree against the same party as to the same cross and the same land. The Government's contention that Buono sought to extend, rather than to enforce, the 2002 injunction is not an argument about standing, but about the merits of the District Court's order. Pp. 7–9.

2. The District Court erred in enjoining the Government from implementing the land-transfer statute on the premise that the relief was necessary to protect Buono's rights under the 2002 injunction. Pp. 9–18.

(a) A court may order an injunction only after taking into account all the circumstances bearing on the need for prospective relief. See, *e.g., United States* v. *Swift & Co.*, 286 U. S. 106, 114. Here, the District Court did not engage in the appropriate inquiry. The land-transfer statute was a substantial change in circumstances bearing on the propriety of the requested relief. By dismissing as illicit the motives of Congress in passing it, the District Court took insufficient

account of the context in which the statute was enacted and the reasons for its passage. Placement of the cross on federal land by private persons was not an attempt to set the state's *imprimatur* on a particular creed. Rather, the intent was simply to honor fallen soldiers. Moreover, the cross stood for nearly seven decades before the statute was enacted, by which time the cross and the cause it commemorated had become entwined in the public consciousness. The 2002 injunction thus presented the Government with a dilemma. It could not maintain the cross without violating the injunction, but it could not remove the cross without conveying disrespect for those the cross was seen as honoring. Deeming neither alternative satisfactory, Congress enacted the land-transfer statute. The statute embodied a legislative judgment that this dispute is best resolved through a framework and policy of accommodation. The statute should not have been dismissed as an evasion, for it brought about a change of law and a congressional statement of policy applicable to the case. Pp. 9–13.

(b) Where legislative action undermines the basis for previous relief, the relevant question is whether an ongoing exercise of the court's equitable authority is supported by the prior showing of illegality, judged against the claim that changed circumstances render prospective relief inappropriate. The District Court granted the 2002 injunction based solely on its conclusion that the presence of the cross on federal land conveyed an impression of governmental endorsement of religion, and the Ninth Circuit affirmed on the same grounds. Neither court considered whether the Government had acted based on an improper purpose. Given this sole reliance on perception, any further relief grounded on the injunction should have rested on the same basis. But the District Court used an injunction granted for one reason (perceived governmental endorsement) as the basis for enjoining conduct that was alleged to be objectionable for a different reason (an illicit governmental purpose). Ordering relief under such circumstances was improper. The court failed to consider whether the change in law and circumstances effected by the land-transfer statute had rendered the "reasonable observer" standard inappropriate to resolve the dispute. Nor did the court attempt to reassess *Buono I*'s findings in light of the accommodation policy embraced by Congress. Rather, it concentrated solely on the religious aspects of the cross, divorced from its background and context. Pp. 13–17.

(c) The same respect for a coordinate branch of Government that forbids striking down an Act of Congress except upon a clear showing of unconstitutionality, see, *e.g., United States* v. *Morrison*, 529 U. S. 598, 607, requires that a congressional command be given effect unless no legal alternative exists. Even if, contrary to the congres-

sional judgment, the land transfer were thought an insufficient accommodation in light of the earlier endorsement finding, it was incumbent upon the District Court to consider less drastic relief than complete invalidation of the statute. See, *e.g., Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 329. On remand, that court should conduct a proper inquiry into the continued necessity for injunctive relief in light of the statute. Pp. 17–18.

JUSTICE ALITO concluded that this case should not be remanded for the lower courts to decide whether implementation of the land-transfer statute would violate the District Court's injunction or the Establishment Clause. Rather, because the factual record has been sufficiently developed to permit resolution of these questions, he would decide them and hold that the statute may be implemented. The case's singular circumstances presented Congress with a delicate problem. Its solution was an approach designed to eliminate any perception of religious sponsorship stemming from the location of the cross on federally owned land, while avoiding the disturbing symbolism that some would associate with the destruction of this historic monument. The mechanism Congress selected is quite common in the West, a "land exchange," whereby ownership of the land on which the cross is located would be transferred to the VFW in exchange for another nearby parcel of equal value. The land transfer would not violate the District Court injunction, the obvious meaning of which was simply that the Government could not allow the cross to remain on *federal* land. Nor would the statute's implementation constitute an endorsement of religion in violation of the Establishment Clause. The so-called "endorsement test" views a challenged religious display through the eyes of a hypothetical reasonable observer aware of the history and all other pertinent facts relating to the display. Here, therefore, this observer would be familiar with the monument's origin and history and thereby appreciate that the transfer represents an effort by Congress to address a unique situation and to find a solution that best accommodates conflicting concerns. Finally, the statute was not enacted for the illicit purpose of embracing the monument's religious message but to commemorate the Nation's war dead and to avoid the disturbing symbolism that would have been created by the monument's destruction. Pp. 1–7.

JUSTICE SCALIA, joined by JUSTICE THOMAS, concluded that this Court need not—indeed, *cannot*—decide this case's merits because Buono lacks Article III standing to pursue the relief he seeks, which is not enforcement of the original injunction but expansion of it. By enjoining the Government from implementing the statute at issue, the District Court's 2005 order went well beyond the original injunction's proscription of the cross's display on public property. Because

Buono seeks new relief, he must show that he has standing to pursue that relief by demonstrating that blocking the land transfer will "redress or prevent an actual or imminently threatened injury to [him] caused by private or official violation of law." *Summers* v. *Earth Island Institute*, 555 U. S. \_\_\_, \_\_\_. He has failed, however, to allege any such injury. Even assuming that being offended by a religious display constitutes a cognizable injury, it is merely speculative whether the cross will remain in place, and in any event Buono has made clear, by admitting he has no objection to Christian symbols on private property, that *he* will not be offended. Neither district courts' discretion to expand injunctions they have issued nor this District Court's characterization of its 2005 order as merely enforcing the existing injunction makes any difference. If in fact a court awards new relief, it must have Article III jurisdiction to do so. Pp. 1–7.

KENNEDY, J., announced the judgment of the Court and delivered an opinion, in which ROBERTS, C. J., joined, and in which ALITO, J., joined in part. ROBERTS, C. J., filed a concurring opinion. ALITO, J., filed an opinion concurring in part and concurring in the judgment. SCALIA, J., filed an opinion concurring in the judgment, in which THOMAS, J., joined. STEVENS, J., filed a dissenting opinion, in which GINSBURG and SOTOMAYOR, JJ., joined. BREYER, J., filed a dissenting opinion.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 08–472

KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* FRANK BUONO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 28, 2010]

JUSTICE KENNEDY announced the judgment of the Court and delivered an opinion, in which THE CHIEF JUSTICE joins and JUSTICE ALITO joins in part.

In 1934, private citizens placed a Latin cross on a rock outcropping in a remote section of the Mojave Desert. Their purpose and intent was to honor American soldiers who fell in World War I. The original cross deteriorated over time, but a reconstructed one now stands at the same place. It is on federal land.

The Court is asked to consider a challenge, not to the first placement of the cross or its continued presence on federal land, but to a statute that would transfer the cross and the land on which it stands to a private party. Department of Defense Appropriations Act, 2004, Pub. L. 108–87, §8121(a), 117 Stat. 1100. The District Court permanently enjoined the Government from implementing the statute. The Court of Appeals affirmed. We conclude that its judgment was in error.

I

A

The Mojave National Preserve (Preserve) spans ap-

proximately 1.6 million acres in southeastern California. The Preserve is nestled within the Mojave Desert, whose picturesque but rugged territory comprises 25,000 square miles, exceeding in size the combined area of the Nation's five smallest States. See Merriam-Webster's Geographical Dictionary 755, 1228–1230 (3d ed. 1997). Just over 90 percent of the land in the Preserve is federally owned, with the rest owned either by the State of California or by private parties. The National Park Service, a division of the Department of the Interior, administers the Preserve as part of the National Park System. 16 U. S. C. §§410aaa–41 and 410aaa–46.

Sunrise Rock is a granite outcropping located within the Preserve. Sunrise Rock and the area in its immediate vicinity are federal land, but two private ranches are located less than two miles away. The record does not indicate whether fencing is used to mark the boundary of these ranches. In 1934, members of the Veterans of Foreign Wars (VFW) mounted a Latin cross on the rock as a memorial to soldiers who died in World War I. A Latin cross consists of two bars—a vertical one and a shorter, horizontal one. The cross has been replaced or repaired at various times over the years, most recently in 1998 by Henry Sandoz. Sandoz is a private citizen who owns land elsewhere in the Preserve, a portion of which he is prepared to transfer to the Government in return for its conveyance to the VFW of the land on which the cross stands, all pursuant to the statute now under review.

The cross, as built by Sandoz, consists of 4-inch diameter metal pipes painted white. The vertical bar is less than eight feet tall. It cannot be seen from the nearest highway, which lies more than 10 miles away. It is visible, however, from Cima Road, a narrow stretch of blacktop that comes within 100 feet of Sunrise Rock.

The cross has been a gathering place for Easter services since it was first put in place; and Sunrise Rock and its

immediate area continue to be used as a campsite. At one time the cross was accompanied by wooden signs stating "'The Cross, Erected in Memory of the Dead of All Wars,' and 'Erected 1934 by Members of Veterans of Foregin [sic] Wars, Death Valley post 2884.'" *Buono* v. *Kempthorne*, 527 F. 3d 758, 769 (CA9 2008). The signs have since disappeared, and the cross now stands unmarked.

## B

Frank Buono, respondent here, is a retired Park Service employee who makes regular visits to the Preserve. Buono claims to be offended by the presence of a religious symbol on federal land. He filed suit in the United States District Court for the Central District of California. He alleged a violation of the Establishment Clause of the First Amendment and sought an injunction requiring the Government to remove the cross.

The litigation proceeded in what can be described as four stages. In the first, the District Court ruled in Buono's favor on opposing motions for summary judgment. *Buono* v. *Norton*, 212 F. Supp. 2d 1202 (CD Cal. 2002) *(Buono I)*. As an initial matter, the court found that Buono had standing to maintain his Establishment Clause challenge. *Id.,* at 1210–1214. On the merits, the parties agreed that the dispute should be governed by the so-called *Lemon* test, which the District Court formulated as follows:

> "A government religious practice or symbol will survive an Establishment Clause challenge when it (1) has a secular purpose, (2) has a primary effect that neither advances nor inhibits religion, and (3) does not foster excessive state entanglement with religion." *Buono I*, *supra*, at 1214–1215 (citing *Lemon* v. *Kurtzman*, 403 U. S. 602, 612–613 (1971)).

The court expressly declined to consider whether the

Government's actions regarding the cross had a secular purpose, 212 F. Supp. 2d, at 1214–1215, or whether they caused excessive entanglement with religion, *id.,* at 1217, n. 9. Instead, the court evaluated the primary effect of the cross by asking how it would be viewed by a "reasonable observer." *Id.,* at 1216. Concluding that presence of the cross on federal land conveyed an impression of governmental endorsement of religion, the court granted Buono's request for injunctive relief. The court's order in *Buono I* (2002 injunction) permanently forbade the Government "from permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve." App. to Pet. for Cert. 146a.

The United States Court of Appeals for the Ninth Circuit stayed the 2002 injunction to the extent that it required the cross to be removed or dismantled but did not forbid alternative methods of complying with the order. The Government covered the cross, first with a tarpaulin and later with a plywood box.

On appeal, the judgment of the District Court was affirmed, both as to standing and on the merits of Buono's Establishment Clause challenge. *Buono* v. *Norton*, 371 F. 3d 543 (CA9 2004) *(Buono II)*. Like the District Court, the Court of Appeals did not decide whether the Government's action, or nonaction, with respect to the cross had been motivated by a secular purpose. *Id.,* at 550. Its ruling was based instead on the conclusion that a reasonable observer would perceive a cross on federal land as governmental endorsement of religion. *Id.,* at 549–550. The Government did not seek review by this Court, so that the judgment of the Court of Appeals in *Buono II* became final.

C

During the relevant proceedings, Congress enacted certain statutes related to the cross:

(1) Before *Buono I* was filed, Congress passed an appropriations bill that included a provision forbidding the use of governmental funds to remove the cross. Consolidated Appropriations Act, 2001, Pub. L. 106–554, §133, 114 Stat. 2763A–230.

(2) While *Buono I* was pending before the District Court, Congress designated the cross and its adjoining land "as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war." Department of Defense Appropriations Act, 2002, Pub. L. 107–117, §8137(a), 115 Stat. 2278. The Secretary of the Interior was directed to expend up to $10,000 to acquire a replica of the original cross and its memorial plaque and to install the plaque at a suitable nearby location. §8137(c).

(3) Three months after *Buono I* was decided, Congress again prohibited the spending of governmental funds to remove the cross. Department of Defense Appropriations Act, 2003, Pub. L. 107–248, §8065(b), 116 Stat. 1551.

(4) While the Government's appeal in *Buono II* was pending, Congress passed a statute (land-transfer statute) directing the Secretary of the Interior to transfer to the VFW the Government's interest in the land that had been designated a national memorial. Department of Defense Appropriations Act, 2004, Pub. L. 108–87, §8121(a), 117 Stat. 1100. In exchange, the Government was to receive land elsewhere in the preserve from Henry Sandoz and his wife. *Ibid.* Any difference in value between the two parcels would be equalized through a cash payment. §§8121(c), (d). The land-transfer statute provided that the property would revert to the Government if not maintained "as a memorial commemorating United States participation in World War I and honoring the American veterans of that war." §8121(e), 117 Stat. 1100. The statute presents a central issue in this case.

The Court of Appeals in *Buono II* did not address the

effect on the suit of a potential land transfer under the
statute. The court noted that the transfer might "take as
long as two years to complete," 371 F. 3d, at 545, and that
its effect was not yet known, *id.,* at 545–546. The court
thus "express[ed] no view as to whether a transfer com-
pleted under [the statute] would pass constitutional mus-
ter." *Id.,* at 546.

D

After the Court of Appeals affirmed in *Buono II*, Buono
returned to the District Court seeking to prevent the land
transfer. He sought injunctive relief against the transfer,
either through enforcement or modification of the 2002
injunction. In evaluating his request the trial court de-
scribed the relevant question as whether the land transfer
was a bona fide attempt to comply with the injunction (as
the Government claimed), or a sham aimed at keeping the
cross in place (as Buono claimed). *Buono* v. *Norton*, 364
F. Supp. 2d 1175, 1178 (CD Cal. 2005) *(Buono III).* In
*Buono III*, the court did not consider whether the transfer
itself was an "independent violation of the Establishment
Clause." *Id.,* at 1182, n. 8. The court nevertheless con-
cluded that the transfer was an attempt by the Govern-
ment to keep the cross atop Sunrise Rock and so was
invalid. The court granted Buono's motion to enforce the
2002 injunction; denied as moot his motion to amend it;
and permanently enjoined the Government from imple-
menting the land-transfer statute. *Id.,* at 1182.

The Court of Appeals again affirmed, largely following
the reasoning of the District Court. *Buono* v. *Kempthorne*,
502 F. 3d 1069 (CA9 2007). The Government's motion for
rehearing en banc was denied over a dissent by Judge
O'Scannlain, 527 F. 3d 758, and this Court granted certio-
rari, 555 U. S. ___ (2009).

II

Before considering the District Court's order on the merits, the first inquiry must be with respect to Buono's standing to maintain this action. To demonstrate standing, a plaintiff must have "alleged such a personal stake in the outcome of the controversy as to warrant *his* invocation of federal-court jurisdiction." *Horne* v. *Flores*, 557 U. S. ___, ___ (2009) (slip op., at 8) (internal quotation marks omitted). The Government argues that Buono's asserted injury is not personal to him and so does not confer Article III standing. As noted above, Buono does not find the cross itself objectionable but instead takes offense at the presence of a religious symbol on federal land. Buono does not claim that, as a personal matter, he has been made to feel excluded or coerced, and so, the Government contends, he cannot object to the presence of the cross. Brief for Petitioners 12–17.

Whatever the validity of the objection to Buono's standing, that argument is not available to the Government at this stage of the litigation. When Buono moved the District Court in *Buono I* for an injunction requiring the removal of the cross, the Government raised the same standing objections it proffers now. Rejecting the Government's position, the District Court entered a judgment in Buono's favor, which the Court of Appeals affirmed in *Buono II*. The Government did not seek review in this Court. The judgment became final and unreviewable upon the expiration of the 90-day deadline under 28 U. S. C. §2101(c) for filing a petition for certiorari. *Toledo Scale Co.* v. *Computing Scale Co.*, 261 U. S. 399, 418 (1923); see *Missouri* v. *Jenkins*, 495 U. S. 33, 45 (1990) (90-day deadline is "mandatory and jurisdictional"). The Government cannot now contest Buono's standing to obtain the final judgment in *Buono I*.

Of course, even though the Court may not reconsider whether Buono had standing to seek the 2002 injunction,

it is still necessary to evaluate his standing in *Buono III* to seek application of the injunction against the land-transfer statute. That measure of relief is embodied in the judgment upon which we granted review.

This was a measure of relief that Buono had standing to seek. A party that obtains a judgment in its favor acquires a "judicially cognizable" interest in ensuring compliance with that judgment. See *Allen* v. *Wright*, 468 U. S. 737, 763 (1984) (plaintiffs' right to enforce a desegregation decree to which they were parties is "a personal interest, created by law, in having the State refrain from taking specific actions"). Having obtained a final judgment granting relief on his claims, Buono had standing to seek its vindication.

The Government does not deny this proposition as a general matter. Instead, it argues that Buono was not seeking to vindicate—but rather to extend—the 2002 injunction. The first injunction forbade the Government from maintaining the cross on Sunrise Rock; yet in *Buono III* he sought to preclude the land transfer, a different governmental action. The Government contends that Buono lacked standing to seek this additional relief. Reply Brief for Petitioners 5.

The Government's argument, however, is properly addressed to the relief granted by the judgment below, not to Buono's standing to seek that relief. The Government has challenged whether appropriate relief was granted in *Buono III* in light of the relevant considerations and legal principles, and we shall consider these questions. The standing inquiry, by contrast, turns on the alleged injury that prompted the plaintiff to invoke the court's jurisdiction in the first place. Buono's entitlement to an injunction having been established in *Buono I* and *II*, he sought in *Buono III* to prevent the Government from frustrating or evading that injunction. Based on the rights he obtained under the earlier decree—against the same party,

regarding the same cross and the same land—his interests in doing so were sufficiently personal and concrete to support his standing. Although Buono also argued that the land transfer should be prohibited as an "independent" Establishment Clause violation, the District Court did not address or order relief on that claim, which is not before us. *Buono III,* 364 F. Supp. 2d, at 1182, n. 8. This is not a case in which a party seeks to import a previous standing determination into a wholly different dispute.

In arguing that Buono sought to extend, rather than to enforce, the 2002 injunction, the Government in essence contends that the injunction did not provide a basis for the District Court to invalidate the land transfer. This is not an argument about standing but about the merits of the District Court's order. Those points now must be addressed.

## III

The procedural history of this litigation must be considered to identify the issues now subject to review. The District Court granted the 2002 injunction after concluding that a cross on federal land violated the Establishment Clause. The Government unsuccessfully challenged that conclusion on appeal, and the judgment became final upon completion of direct review. At that point, the judgment "became res judicata to the parties and those in privity with them, not only as to every matter which was offered and received to sustain or defeat the claim or demand, but as to any other admissible matter which might have been offered for that purpose." *Travelers Indemnity Co.* v. *Bailey*, 557 U. S. ___, ___ (2009) (slip op., at 14) (internal quotation marks omitted). The Government therefore does not—and could not—ask this Court to reconsider the propriety of the 2002 injunction or the District Court's reasons for granting it.

The question now before the Court is whether the Dis-

trict Court properly enjoined the Government from implementing the land-transfer statute. The District Court did not consider whether the statute, in isolation, would have violated the Establishment Clause, and it did not forbid the land transfer as an independent constitutional violation. *Buono III*, *supra*, at 1182, n. 8. Rather, the court enjoined compliance with the statute on the premise that the relief was necessary to protect the rights Buono had secured through the 2002 injunction.

An injunction is an exercise of a court's equitable authority, to be ordered only after taking into account all of the circumstances that bear on the need for prospective relief. See *United States* v. *Swift & Co.*, 286 U. S. 106, 114 (1932). See also *Weinberger* v. *Romero-Barcelo*, 456 U. S. 305, 312 (1982); *Hecht Co.* v. *Bowles*, 321 U. S. 321, 329 (1944); 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2942, pp. 39–42 (2d ed. 1995) (hereinafter Wright & Miller). Equitable relief is not granted as a matter of course, see *Weinberger*, 456 U. S., at 311–312, and a court should be particularly cautious when contemplating relief that implicates public interests, see *id.,* at 312 ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction"); *Harrisonville* v. *W. S. Dickey Clay Mfg. Co.*, 289 U. S. 334, 338 (1933) ("Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling"). Because injunctive relief "is drafted in light of what the court believes will be the future course of events, . . . a court must never ignore significant changes in the law or circumstances underlying an injunction lest the decree be turned into an 'instrument of wrong.'" Wright & Miller §2961, at 393–394 (quoting *Swift & Co., supra*, at 115).

Here, the District Court did not engage in the appropriate inquiry. The land-transfer statute was a substantial

change in circumstances bearing on the propriety of the requested relief. The court, however, did not acknowledge the statute's significance. It examined the events that led to the statute's enactment and found an intent to prevent removal of the cross. Deeming this intent illegitimate, the court concluded that nothing of moment had changed. This was error. Even assuming that the land-transfer statute was an attempt to prevent removal of the cross, it does not follow that an injunction against its implementation was appropriate.

By dismissing Congress's motives as illicit, the District Court took insufficient account of the context in which the statute was enacted and the reasons for its passage. Private citizens put the cross on Sunrise Rock to commemorate American servicemen who had died in World War I. Although certainly a Christian symbol, the cross was not emplaced on Sunrise Rock to promote a Christian message. Cf. *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 661 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part) ("[T]he [Establishment] Clause forbids a city to permit the permanent erection of a large Latin cross on the roof of city hall . . . because such an obtrusive year-round religious display would place the government's weight behind an obvious effort to proselytize on behalf of a particular religion"). Placement of the cross on Government-owned land was not an attempt to set the *imprimatur* of the state on a particular creed. Rather, those who erected the cross intended simply to honor our Nation's fallen soldiers. See Brief for Veterans of Foreign Wars of the United States et al. as *Amici Curiae* 15 (noting that the plaque accompanying the cross "was decorated with VFW decals").

Time also has played its role. The cross had stood on Sunrise Rock for nearly seven decades before the statute was enacted. By then, the cross and the cause it com-

memorated had become entwined in the public consciousness. See *ibid.* Members of the public gathered regularly at Sunrise Rock to pay their respects. Rather than let the cross deteriorate, community members repeatedly took it upon themselves to replace it. Congress ultimately designated the cross as a national memorial, ranking it among those monuments honoring the noble sacrifices that constitute our national heritage. See note following 16 U. S. C. §431 (listing officially designated national memorials, including the National D-Day Memorial and the Vietnam Veterans Memorial). Research discloses no other national memorial honoring American soldiers—more than 300,000 of them—who were killed or wounded in World War I. See generally A. Leland & M. Oboroceanu, Congressional Research Service Report for Congress, American War and Military Operations Casualties: Lists and Statistics 2 (2009). It is reasonable to interpret the congressional designation as giving recognition to the historical meaning that the cross had attained. Cf. *Van Orden* v. *Perry*, 545 U. S. 677, 702–703 (2005) (BREYER, J., concurring in judgment) ("40 years" without legal challenge to a Ten Commandments display "suggest that the public visiting the [surrounding] grounds has considered the religious aspect of the tablets' message as part of what is a broader moral and historical message reflective of a cultural heritage").

The 2002 injunction thus presented the Government with a dilemma. It could not maintain the cross without violating the injunction, but it could not remove the cross without conveying disrespect for those the cross was seen as honoring. Cf. *id.,* at 704 (to invalidate a longstanding Ten Commandments display might "create the very kind of religiously based divisiveness that the Establishment Clause seeks to avoid"). Deeming neither alternative to be satisfactory, Congress enacted the statute here at issue. Congress, of course, may not use its legislative powers to

reopen final judgments. See *Plaut* v. *Spendthrift Farm, Inc.*, 514 U. S. 211, 225–226 (1995). That principle, however, was not a bar to this statute. The Government's right to transfer the land was not adjudicated in *Buono I* or compromised by the 2002 injunction.

In belittling the Government's efforts as an attempt to "evade" the injunction, *Buono III*, 364 F. Supp. 2d, at 1182, the District Court had things backwards. Congress's prerogative to balance opposing interests and its institutional competence to do so provide one of the principal reasons for deference to its policy determinations. See *Patsy* v. *Board of Regents of Fla.*, 457 U. S. 496, 513 (1982). Here, Congress adopted a policy with respect to land it now owns in order to resolve a specific controversy. Congress, the Executive, and the Judiciary all have a duty to support and defend the Constitution. See *United States* v. *Nixon*, 418 U. S. 683, 703 (1974) ("In the performance of assigned constitutional duties each branch of the Government must initially interpret the Constitution, and the interpretation of its powers by any branch is due great respect from the others"). The land-transfer statute embodies Congress's legislative judgment that this dispute is best resolved through a framework and policy of accommodation for a symbol that, while challenged under the Establishment Clause, has complex meaning beyond the expression of religious views. That judgment should not have been dismissed as an evasion, for the statute brought about a change of law and a congressional statement of policy applicable to the case.

Buono maintains that any governmental interest in keeping the cross up must cede to the constitutional concerns on which the 2002 injunction was based. He argues that the land transfer would be "an incomplete remedy" to the constitutional violation underlying the injunction and that the transfer would make achieving a proper remedy more difficult. Brief for Respondent 54.

A court must find prospective relief that fits the remedy to the wrong or injury that has been established. See *Swift & Co.*, 286 U. S., at 114 ("A continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need"). See also *United States* v. *United Shoe Machinery Corp.*, 391 U. S. 244, 249 (1968). Where legislative action has undermined the basis upon which relief has previously been granted, a court must consider whether the original finding of wrongdoing continues to justify the court's intervention. See *Railway Employees* v. *Wright*, 364 U. S. 642, 648–649 (1961); *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 430–432 (1856). The relevant question is whether an ongoing exercise of the court's equitable authority is supported by the prior showing of illegality, judged against the claim that changed circumstances have rendered prospective relief inappropriate.

The District Court granted the 2002 injunction based solely on its conclusion that presence of the cross on federal land conveyed an impression of governmental endorsement of religion. The court expressly disavowed any inquiry into whether the Government's actions had a secular purpose or caused excessive entanglement. *Buono I*, 212 F. Supp. 2d, at 1215, 1217, n. 9. The Court of Appeals affirmed the injunction on the same grounds, similarly eschewing any scrutiny of governmental purpose. *Buono II*, 371 F. 3d, at 550.

Although, for purposes of the opinion, the propriety of the 2002 injunction may be assumed, the following discussion should not be read to suggest this Court's agreement with that judgment, some aspects of which may be questionable. The goal of avoiding governmental endorsement does not require eradication of all religious symbols in the public realm. A cross by the side of a public highway marking, for instance, the place where a state trooper perished need not be taken as a statement of governmen-

tal support for sectarian beliefs. The Constitution does not oblige government to avoid any public acknowledgment of religion's role in society. See *Lee* v. *Weisman*, 505 U. S. 577, 598 (1992) ("A relentless and all-pervasive attempt to exclude religion from every aspect of public life could itself become inconsistent with the Constitution"). See also *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints* v. *Amos*, 483 U. S. 327, 334 (1987) ("This Court has long recognized that the government may (and sometimes must) accommodate religious practices and that it may do so without violating the Establishment Clause" (internal quotation marks omitted)). Rather, it leaves room to accommodate divergent values within a constitutionally permissible framework.

Even assuming the propriety of the original relief, however, the question before the District Court in *Buono III* was whether to invalidate the land transfer. Given the sole reliance on perception as a basis for the 2002 injunction, one would expect that any relief grounded on that decree would have rested on the same basis. But the District Court enjoined the land transfer on an entirely different basis: its suspicion of an illicit governmental purpose. See *Buono III*, 364 F. Supp. 2d, at 1182. The court made no inquiry into the effect that knowledge of the transfer of the land to private ownership would have had on any perceived governmental endorsement of religion, the harm to which the 2002 injunction was addressed. The District Court thus used an injunction granted for one reason as the basis for enjoining conduct that was alleged to be objectionable for a different reason. Ordering relief under such circumstances was improper—absent a finding that the relief was necessary to address an independent wrong. See *ibid.*, n. 8 (noting that the court "need not consider [Buono's] other contention that the land transfer itself is an independent violation of the Establishment Clause").

The District Court should have evaluated Buono's modification request in light of the objectives of the 2002 injunction. The injunction was issued to address the impression conveyed by the cross on federal, not private, land. Even if its purpose were characterized more generally as avoiding the perception of governmental endorsement, that purpose would favor—or at least not oppose—ownership of the cross by a private party rather than by the Government. Cf. *Pleasant Grove City* v. *Summum*, 555 U. S. ___, ___ (2009) (slip op., at 8) ("[P]ersons who observe donated monuments routinely—and reasonably—interpret them as conveying some message on the property owner's behalf").

Buono argues that the cross would continue to stand on Sunrise Rock, which has no visual differentiation from the rest of the primarily federally owned Preserve. He also points to the reversionary clause in the land-transfer statute requiring that the land be returned to the Government if not maintained as a World War I memorial. Finally, he notes that the cross remains designated a national memorial by an Act of Congress, which arguably would prevent the VFW from dismantling the cross even if it wanted to do so. Brief for Respondent 37–48.

The District Court failed to consider whether, in light of the change in law and circumstances effected by the land-transfer statute, the "reasonable observer" standard continued to be the appropriate framework through which to consider the Establishment Clause concerns invoked to justify the requested relief. As a general matter, courts considering Establishment Clause challenges do not inquire into "reasonable observer" perceptions with respect to objects on private land. Even if, however, this standard were the appropriate one, but see *County of Allegheny*, 492 U. S., at 668 (KENNEDY, J., concurring in judgment in part and dissenting in part) (criticizing the "reasonable observer" test); *Capitol Square Review and Advisory Bd.* v.

*Pinette*, 515 U. S. 753 763–768 (1995) (plurality opinion) (criticizing reliance on "perceived endorsement"), it is not clear that Buono's claim is meritorious. That test requires the hypothetical construct of an objective observer who knows all of the pertinent facts and circumstances surrounding the symbol and its placement. See *id.*, at 780 (O'Connor, J., concurring in part and concurring in judgment). But see *id.,* at 767–768 (plurality opinion) (doubting the workability of the reasonable observer test). Applying this test here, the message conveyed by the cross would be assessed in the context of all relevant factors. See *Van Orden*, 545 U. S., at 700 (BREYER, J., concurring in judgment) (the Establishment Clause inquiry "must take account of context and consequences"); *Lee*, *supra*, at 597 ("Our Establishment Clause jurisprudence remains a delicate and fact-sensitive one").

The District Court did not attempt to reassess the findings in *Buono I* in light of the policy of accommodation that Congress had embraced. Rather, the District Court concentrated solely on the religious aspects of the cross, divorced from its background and context. But a Latin cross is not merely a reaffirmation of Christian beliefs. It is a symbol often used to honor and respect those whose heroic acts, noble contributions, and patient striving help secure an honored place in history for this Nation and its people. Here, one Latin cross in the desert evokes far more than religion. It evokes thousands of small crosses in foreign fields marking the graves of Americans who fell in battles, battles whose tragedies are compounded if the fallen are forgotten.

Respect for a coordinate branch of Government forbids striking down an Act of Congress except upon a clear showing of unconstitutionality. See *United States* v. *Morrison*, 529 U. S. 598, 607 (2000); *El Paso & Northeastern R. Co.* v. *Gutierrez*, 215 U. S. 87, 96 (1909). The same respect requires that a congressional command be given

effect unless no legal alternative exists. Even if, contrary to the congressional judgment, the land transfer were thought an insufficient accommodation in light of the earlier finding of religious endorsement, it was incumbent upon the District Court to consider less drastic relief than complete invalidation of the land-transfer statute. See *Ayotte* v. *Planned Parenthood of Northern New Eng.*, 546 U. S. 320, 329 (2006) (in granting relief, "we try not to nullify more of a legislature's work than is necessary, for we know that [a] ruling of unconstitutionality frustrates the intent of the elected representatives of the people" (internal quotation marks omitted; alteration in original)); *Alaska Airlines, Inc.* v. *Brock*, 480 U. S. 678, 684 (1987). For instance, if there is to be a conveyance, the question might arise regarding the necessity of further action, such as signs to indicate the VFW's ownership of the land. As we have noted, Congress directed the Secretary of the Interior to install near the cross a replica of its original memorial plaque. One of the signs that appears in early photographs of the cross specifically identifies the VFW as the group that erected it.

Noting the possibility of specific remedies, however, is not an indication of agreement about the continued necessity for injunctive relief. The land-transfer statute's bearing on this dispute must first be determined. To date, this Court's jurisprudence in this area has refrained from making sweeping pronouncements, and this case is ill suited for announcing categorical rules. In light of the finding of unconstitutionality in *Buono I*, and the highly fact-specific nature of the inquiry, it is best left to the District Court to undertake the analysis in the first instance. On remand, if Buono continues to challenge implementation of the statute, the District Court should conduct a proper inquiry as described above.

Opinion of KENNEDY, J.

\*      \*      \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–472

———————

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* FRANK BUONO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 28, 2010]

CHIEF JUSTICE ROBERTS, concurring.

At oral argument, respondent's counsel stated that it "likely would be consistent with the injunction" for the Government to tear down the cross, sell the land to the Veterans of Foreign Wars, and return the cross to them, with the VFW immediately raising the cross again. Tr. of Oral Arg. 44. I do not see how it can make a difference for the Government to skip that empty ritual and do what Congress told it to do—sell the land with the cross on it. "The Constitution deals with substance, not shadows." *Cummings* v. *Missouri*, 4 Wall. 277, 325 (1867).

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–472

———————

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* FRANK BUONO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 28, 2010]

JUSTICE ALITO, concurring in part and concurring in the judgment.

I join JUSTICE KENNEDY's opinion in all respects but one: I would not remand this case for the lower courts to decide whether implementation of the land-transfer statute enacted by Congress in 2003, Department of Defense Appropriations Act, 2004, §8121, would violate the District Court's injunction or the Establishment Clause. The factual record has been sufficiently developed to permit resolution of these questions, and I would therefore decide them and hold that the statute may be implemented.

The singular circumstances surrounding the monument on Sunrise Rock presented Congress with a delicate problem, and the solution that Congress devised is true to the spirit of practical accommodation that has made the United States a Nation of unparalleled pluralism and religious tolerance. In brief, the situation that Congress faced was as follows.

After service in the First World War, a group of veterans moved to the Mojave Desert, in some cases for health reasons.[1]   They joined the Veterans of Foreign Wars

————————

[1] See Memorandum from Mark Luellen, Historian, Dept. of Interior, to Superintendent, Mojave National Preserve (Jan. 31, 2000) (Luellen Memo), Decl. of Charles R. Shockey in *Buono* v. *Norton*, No. EDCV01–216–RT (CD Cal., Mar. 13, 2002) (Exh. 17); Brief for VFW et al. as

(VFW), Death Valley Post 2884, and in 1934, they raised a simple white cross on an outcropping called Sunrise Rock to honor fallen American soldiers.[2] These veterans selected Sunrise Rock "in part because they believed there was a color shading on the Rock in the shape of an American soldier or 'doughboy.'"[3]

One of these men was John Riley Bembry, a miner who had served as a medic and had thus presumably witnessed the carnage of the war firsthand.[4] It is said that Mr. Bembry was not a particularly religious man, but he nevertheless agreed to look after the cross and did so for some years.[5]

The Sunrise Rock monument was located on land belonging to the Federal Government, but in this part of the country, where much of the land is federally owned, boundaries between Government and private land are often not marked,[6] and private citizens are permitted to go on and to use federal land for a variety of purposes.[7] Al-

---

*Amici Curiae* 6–7, 15 (hereinafter VFW Brief); see also B. Ausmus, East Mojave Diary 116 (1989) (hereinafter Ausmus).

[2] See Luellen Memo; VFW Brief 15–16.

[3] *Id.*, at 15.

[4] See Tr. of Oral Arg. 55; VFW Brief 7, 16; see also Ausmus 116.

[5] See VFW Brief 7, 16.

[6] See App. 79, 81 (testimony of respondent) (noting that when he first saw the monument, he did not know whether it was on public or private land); *id.*, at 80 (describing Mojave Preserve as "primarily federal land with a large amount of inholdings of non-federal land"); see also *Wilkie* v. *Robbins*, 551 U. S. 537, 541–543 (2007).

[7] See Taylor Grazing Act, 48 Stat. 1269, as amended, 43 U. S. C. §315 *et seq.;* General Mining Act of 1872, Rev. Stat. 2319, 30 U. S. C. §22; *Andrus* v. *Shell Oil Co.*, 446 U. S. 657, 658 (1980); see also E. Nystrom, Dept. of Interior, National Park Service, From Neglected Space To Protected Place: An Administrative History of Mojave National Preserve, ch. 2 (Mar. 2003) (describing mining and grazing in Mojave Preserve), online at http://www.nps.gov/history/history/online_books/moja/adhi.htm (all Internet materials as visited Apr. 23, 2010, and available in Clerk of Court's case file).

though Sunrise Rock was federally owned, Mr. Bembry and his fellow veterans took it upon themselves to place their monument on that spot, apparently without obtaining approval from any federal officials, and this use of federal land seems to have gone largely unnoticed for many years, in all likelihood due to the spot's remote and rugged location.

Sunrise Rock is situated far from any major population center; temperatures often exceed 100 degrees Fahrenheit in the summer; and visitors are warned of the dangers of traveling in the area.[8]  As a result, at least until this litigation, it is likely that the cross was seen by more rattlesnakes than humans.

Those humans who made the trip to see the monument appear to have viewed it as conveying at least two significantly different messages.  See *Pleasant Grove City, Utah* v. *Summum,* 555 U. S. \_\_\_, \_\_\_–\_\_\_ (2009) (slip op., at 11–12) ("The meaning conveyed by a monument is generally not a simple one," and a monument may be "interpreted by different observers, in a variety of ways").  The cross is of course the preeminent symbol of Christianity, and  Easter services have long been held on Sunrise Rock, 371 F. 3d 543, 548 (CA9 2004).  But, as noted, the original reason for the placement of the cross was to commemorate American war dead and, particularly for those with searing memories of The Great War, the symbol that was selected, a plain unadorned white cross, no doubt evoked the unforgettable image of the white crosses, row on row, that marked the final resting places of so many American soldiers who fell in that conflict.

This is roughly how things stood until the plaintiff in

———————————

[8] See Dept. of Interior, National Park Service, Mojave National Preserve, Operating Hours & Seasons, http://www.nps.gov/moja/planyourvisit/hours.htm; D. Casebier, Mojave Road Guide: An Adventure Through Time 114 (1999); 371 F. 3d 543, 549 (CA9 2004).

this case, an employee of the National Park Service who
sometimes viewed the cross during the performance of his
duties and claims to have been offended by its presence on
federally owned land, brought this suit and obtained an
injunction restraining the Federal Government from
"permitting the display of the Latin cross in the area of
Sunrise Rock." App. to Pet. for Cert. 146a. After the
Ninth Circuit affirmed that decision, and the Government
elected not to seek review by this Court, Congress faced a
problem.

  If Congress had done nothing, the Government would
have been required to take down the cross, which had
stood on Sunrise Rock for nearly 70 years, and this re-
moval would have been viewed by many as a sign of disre-
spect for the brave soldiers whom the cross was meant to
honor. The demolition of this venerable if unsophisticated,
monument would also have been interpreted by some as an
arresting symbol of a Government that is not neutral but
hostile on matters of religion and is bent on eliminating
from all public places and symbols any trace of our coun-
try's religious heritage. Cf. *Van Orden* v. *Perry*, 545 U. S.
677, 704 (2005) (BREYER, J., concurring in judgment).

  One possible solution would have been to supplement
the monument on Sunrise Rock so that it appropriately
recognized the religious diversity of the American soldiers
who gave their lives in the First World War. In American
military cemeteries overseas, the graves of soldiers who
perished in that war were marked with either a white
cross or a white Star of David.[9] More than 3,500 Jewish

_____

  [9] See D. Holt, American Military Cemeteries 473, 474 (1992); see
also American Battle Monuments Commission, http://www.abmc.gov/
cemeteries/cemeteries.php (containing photographs of the two
types of markers). This policy presumably reflected the relig-
ious makeup of the Armed Forces at the time of the First World
War. Today, veterans and their families may select any of 39
types of headstones. See U. S. Dept. of Veterans Affairs, Available

soldiers gave their lives for the United States in World War I,[10] and Congress might have chosen to place a Star of David on Sunrise Rock so that the monument would duplicate those two types of headstones. But Congress may well have thought—not without reason—that the addition of yet another religious symbol would have been unlikely to satisfy the plaintiff, his attorneys, or the lower courts that had found the existing monument to be unconstitutional on the ground that it impermissibly endorsed religion.

Congress chose an alternative approach that was designed to eliminate any perception of religious sponsorship stemming from the location of the cross on federally owned land, while at the same time avoiding the disturbing symbolism associated with the destruction of the historic monument. The mechanism that Congress selected is one that is quite common in the West, a "land exchange."[11] Congress enacted a law under which ownership of the parcel of land on which Sunrise Rock is located would be transferred to the VFW in exchange for another nearby parcel of equal value. Congress required that the Sunrise Rock parcel be used for a war memorial, §8121(a), 117 Stat. 1100, but Congress did not prevent the VFW from supplementing the existing monument or replacing it with a war memorial of a different design. Although JUSTICE

_____

Emblems of Belief for Placement on Government Headstones and Markers, http://www.cem.va.gov/hm/hmemb.asp.

[10] See J. Fredman & L. Falk, Jews in American Wars 100–101 (5th ed. 1954); Brief for Jewish War Veterans of the United States of America, Inc. as *Amicus Curiae* 33.

[11] See G. Draffan & J. Blaeloch, Commons or Commodity? The Dilemma of Federal Land Exchanges 10 (2000). Congressionally authorized land exchanges are common. See, *e.g.*, Consolidated Natural Resources Act of 2008, §101(d), 122 Stat. 758; National Defense Authorization Act for Fiscal Year 2008, §2845, 122 Stat. 554; City of Yuma Improvement Act, §3, 120 Stat. 3369; Act of Dec. 23, 2004, §1, 118 Stat. 3919.

STEVENS characterizes this land exchange as one that
endorses "a particular religious view," *post*, at 26 (dissent-
ing opinion), it is noteworthy that Congress, in which our
country's religious diversity is well represented, passed
this law by overwhelming majorities: 95–0 in the Senate
and 407–15 in the House. See 149 Cong. Rec. H8793
(Sept. 24, 2003); *id.*, at S11943 (Sept. 25, 2003). In my
view, there is no legal ground for blocking the implemen-
tation of this law.

The dissent contends that the land transfer would vio-
late the District Court injunction, but that argument, for
the reasons explained in JUSTICE SCALIA's opinion, see
*post*, at 2 (concurring in judgment), is plainly unsound.
The obvious meaning of the injunction was simply that the
Government could not allow the cross to remain on *federal*
land.

There is also no merit in JUSTICE STEVENS' contention
that implementation of the statute would constitute an
endorsement of Christianity and would thus violate the
Establishment Clause. Assuming that it is appropriate to
apply the so-called "endorsement test," this test would not
be violated by the land exchange. The endorsement test
views a challenged display through the eyes of a hypo-
thetical reasonable observer who is deemed to be aware of
the history and all other pertinent facts relating to a
challenged display. See *ante*, at 16–17 (opinion of
KENNEDY, J.). Here, therefore, this observer would be
familiar with the origin and history of the monument and
would also know both that the land on which the monu-
ment is located is privately owned and that the new owner
is under no obligation to preserve the monument's present
design. With this knowledge, a reasonable observer would
not view the land exchange as the equivalent of the con-
struction of an official World War I memorial on the Na-
tional Mall. Cf. *post*, at 26. Rather, a well-informed ob-
server would appreciate that the transfer represents an

effort by Congress to address a unique situation and to find a solution that best accommodates conflicting concerns.

Finally, I reject JUSTICE STEVENS' suggestion that the enactment of the land-transfer law was motivated by an illicit purpose. *Id.* at 24. I would not be "so dismissive of Congress." *Citizens United* v. *Federal Election Comm'n*, 558 U. S. ___, ___ (2010) (slip op., at 70) (STEVENS, J., concurring in part and dissenting in part). Congress has shown notable solicitude for the rights of religious minorities. See, *e.g.*, Religious Freedom Restoration Act of 1993, 42 U. S. C. §2000bb *et seq.;* Religious Land Use and Institutionalized Persons Act of 2000, 42 U. S. C. §2000cc *et seq.* I would not jump to the conclusion that Congress' aim in enacting the land-transfer law was to embrace the religious message of the cross; rather, I see no reason to doubt that Congress' consistent goal, in legislating with regard to the Sunrise Rock monument, has been to commemorate our Nation's war dead and to avoid the disturbing symbolism that would have been created by the destruction of the monument.

For these reasons, I would reverse the decision below and remand with instructions to vacate the order prohibiting the implementation of the land-transfer statute.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–472

_____

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* FRANK BUONO

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[April 28, 2010]

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring in the judgment.

I agree with the plurality that the Court of Appeals erred in affirming the District Court's order enjoining the transfer of the memorial to the Veterans of Foreign Wars (VFW). My reason, however, is quite different: In my view we need not—indeed, *cannot*—decide the merits of the parties' dispute, because Frank Buono lacks Article III standing to pursue the relief he seeks. The District Court had no power to award the requested relief, and our authority is limited to "'announcing the fact and dismissing the cause.'" *Steel Co.* v. *Citizens for Better Environment*, 523 U. S. 83, 94 (1998) (quoting *Ex parte McCardle*, 7 Wall. 506, 514 (1869)).

The plurality is correct that Buono's standing to obtain the *original* injunction is not before us. See *ante*, at 7.[1]

---

[1] The Court of Appeals' conclusion that Buono had standing to seek the original injunction does not, however, control our decision here under the law-of-the-case doctrine. That doctrine comes into play only if an issue we are asked to resolve has already been decided in the same litigation. See *Quern* v. *Jordan*, 440 U. S. 332, 347, n. 18 (1979). In its earlier decision, the Ninth Circuit addressed only Buono's standing to seek the original injunction barring the display of the cross on public land. See *Buono* v. *Norton*, 371 F. 3d 543, 546–548 (2004). It had no occasion to address his standing to seek an expansion of the injunction to bar a transfer enabling the cross's display on private property.

Nor is Buono's standing to request enforcement of the original injunction at issue. If he sought only to compel compliance with the existing order, Article III would not stand in his way.

As the plurality all but admits, however, the relief Buono requests and the District Court awarded in *this* proceeding is not enforcement of the original injunction but expansion of it. See *ante*, at 15. The only reasonable reading of the original injunction, in context, is that it proscribed the cross's display on federal land. Buono's alleged injuries arose from the cross's presence on public property, see App. 50, 59, and the injunction accordingly prohibited the Government, its "employees, agents, and those in active concert with [them] . . . from permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve." App. to Pet. for Cert. 146a. Barring the Government from "permitting" the cross's display at a particular location makes sense only if the Government owns the location. As the proprietor, it can remove the cross that private parties have erected and deny permission to erect another. But if the land is privately owned, the Government can prevent the cross's display only by making it *illegal*. Prohibitory legislation does not consist of a mere refusal to "permi[t]," nor is the enactment of legislation what the injunction commanded (a command that would raise serious First Amendment and separation-of-powers questions).[2]

———————

Moreover, Buono failed to raise the issue in his brief in opposition to certiorari, and we may deem it waived. See this Court's Rule 15.2; cf. *Knowles* v. *Iowa*, 525 U. S. 113, 116, n. 2 (1998).

[2] The principal dissent does not dispute that the original injunction did not require the Government to ban the cross's display on private land, yet it insists that the injunction nonetheless forbade transferring the land to a private party who could keep the cross in place. *Post*, at 6–7 (opinion of STEVENS, J.). But there is no basis in the injunction's text for treating a sale of the land to a private purchaser who does not promise to take the cross down as "permitting" the cross's display,

The District Court's 2005 order purporting to "enforce" the earlier injunction went well beyond barring the display of the cross on public property. *Id.*, at 98a. At Buono's request, the court enjoined certain Government officials and "anyone acting in concert with them . . . from implementing the provisions of Section 8121 of Public Law 108–87," the statutory provision enacted after the original injunction that directs the Executive Branch to transfer the memorial to the VFW. *Id.*, at 99a.

Because Buono seeks new relief, he must show (and the District Court should have ensured) that he has standing to pursue it. As the party invoking federal-court jurisdiction, Buono "bears the burden of showing that he has standing for each type of relief sought," *Summers* v. *Earth Island Institute*, 555 U. S. ___, ___ (2009) (slip op., at 4); see *Los Angeles* v. *Lyons*, 461 U. S. 95, 105 (1983). A plaintiff cannot sidestep Article III's requirements by combining a request for injunctive relief for which he *has* standing with a request for injunctive relief for which he *lacks* standing. And for the same reason, a plaintiff cannot ask a court to expand an existing injunction unless he has standing to seek the additional relief.

Buono must therefore demonstrate that the additional relief he sought—blocking the transfer of the memorial to a private party—will "redress or prevent actual or imminently threatened injury to [him] caused by private or

———————

when failing to forbid the cross's presence on already-private land within the Mojave National Preserve would not be treated as such. The latter no less involves "allow[ing] the act or existence of" or "tolerat[ing]" the display of the cross. Webster's New International Dictionary 1824 (2d ed. 1957). The principal dissent responds that in determining whether the transfer complies with the original injunction we "cannot start from a baseline in which the cross has *already* been transferred." *Post*, at 7. But the effect of transferring the land to a private party free to keep the cross standing is identical, so far as the original injunction is concerned, to allowing a party who already owned the land to leave the cross in place.

official violation of law." *Summers*, *supra*, at ___ (slip op.,
at 4). He has failed, however, to allege any actual or
imminent injury. To begin with, the predicate for any
injury he might assert—that the VFW, after taking pos-
session of the land, will continue to display the cross—is at
this stage merely speculative.[3] Nothing in the statutes
compels the VFW (or any future proprietor) to keep it up.
The land reverts to the Government only if "the
conveyed property is no longer being maintained as a war
memorial," Pub. L. 108–87, §8121(e), 117 Stat. 1100,
which does not depend on whether the cross remains.[4]

Moreover, Buono has not alleged, much less established,
that he will be harmed if the VFW does decide to keep the
cross. To the contrary, his amended complaint averred
that "he is deeply offended by the display of a Latin Cross
on government-owned property" but "has no objection to
Christian symbols on private property." App. 50. In a
subsequent deposition he agreed with the statement that
"[t]he only thing that's offensive about this cross is that
[he has] discovered that it's located on federal land." *Id.*,
at 85. And in a signed declaration several months later,

————————

[3] Buono argues that the Government's continued supervision of the
site, its reversionary interest in the property, and the memorial's
ongoing designation as a national memorial add to the Establishment
Clause violation. Brief for Respondent 37–48. But those aspects would
be irrelevant if the cross were no longer displayed.

[4] The principal dissent insists, *post*, at 4–5, n. 2, that it is clear the
cross will remain because the VFW asserted in an *amicus* brief that it
"intends to maintain and preserve the Veterans Memorial as a memo-
rial to United States veterans," and elsewhere referred to "the seven-
foot-tall cross and plaque that comprise the Veterans Memorial," Brief
for VFW of the United States et al. as *Amici Curiae* 4, 7. But the
group's stated intentions do not prove that the cross will stay put. The
VFW might not follow through on its plans (this VFW post already
became "defunct" once during this litigation, *id.*, at 34); it might move
the cross to another private parcel and substitute a different monument
on Sunrise Rock; or it might sell the land to someone else who decides
to honor the dead without the cross.

he reiterated that although the "presence of the cross on
federally owned land in the Preserve deeply offends [him]
and impairs [his] enjoyment of the Preserve," he "ha[s] no
objection to Christian symbols on private property." *Id.*, at
64–65.  In short, even assuming that being "deeply of-
fended" by a religious display (and taking steps to avoid
seeing it) constitutes a cognizable injury, Buono has made
clear that *he* will not be offended.[5]

These same considerations bear upon the plurality's
assertion that Buono has standing to "prevent the Gov-
ernment from frustrating or evading" the original injunc-
tion, *ante*, at 8.  If this refers to frustration or evasion in a
narrow sense, the injunction is in no need of—indeed, is
insusceptible of—protection.  It was issued to remedy the
sole complaint that Buono had brought forward: erection
of a cross on public land.  And it was entirely effective in
remedying that complaint, having induced Congress to
abandon public ownership of the land.  If meant in this
narrow sense, the plurality's assertion of a need to prevent
frustration or evasion by the Government ignores the
reality that the District Court's 2005 order awarded new
relief beyond the scope of the original injunction.  The
revised injunction is directed at Buono's *new* complaint
that the manner of abandoning public ownership and the

———————

    [5]The principal dissent argues that despite these disclaimers in
Buono's complaint, deposition, and declaration, his real injury is his
inability "to freely use the area of the Preserve around the cross be-
cause the Government's unconstitutional endorsement of the cross will
induce him to avoid the Sunrise Rock area." *Post*, at 4–5, n. 2 (internal
quotation marks and citation omitted).  But the only "endorsement" of
which Buono complained was "[t]he placement of the Cross on feder-
ally-owned land," App. 59, which "offend[s]" him only because the
property "is not open to groups and individuals to erect other freestand-
ing, permanent displays," App. 50.  Nothing in Buono's complaint,
deposition, or declaration establishes that he will be unable "to freely
use the area of the Preserve" if Sunrise Rock is made private property
and its new proprietor displays the cross.

nature of the new private ownership violate the Estab-
lishment Clause.  Now it may be that a court has subject-
matter jurisdiction to prevent frustration or evasion of its
prior injunction in a broader sense—that is, to eliminate
an unconstitutional manner of satisfying that prior injunc-
tion.  But it surely cannot do so unless it has before it
someone who has standing to complain of that unconstitu-
tional manner.  If preventing frustration or evasion of an
injunction includes expanding it to cover additional ac-
tions that produce no concrete harm to the original plain-
tiff, our standing law in this area will make no sense.

It is no answer that a district court has discretion to
expand an injunction it has issued if it finds the existing
terms are not fulfilling the original purpose.  Doubtless it
can do that, and is in that sense the master of its own
injunctions.  But whether the District Court abused that
discretion by enlarging the injunction is beside the point.
What matters is that it granted relief beyond the existing
order, and that Buono must have had standing to seek the
extension.

It also makes no difference that the District Court *said*
it was merely enforcing its original injunction.  The ques-
tion is whether *in fact* the new order goes beyond the old
one.  If so, the court must satisfy itself of jurisdiction to
award the additional relief—which includes making cer-
tain the plaintiff has standing.  See *Steel Co.*, 523 U. S., at
94.  That is true whether the court revisits the injunction
at a party's request or on its own initiative; Article III's
case-or-controversy requirement is not merely a prerequi-
site to relief, but a restraint on judicial power.  See *Sum-
mers*, *supra*, at ___ (slip op., at 4).[6]

―――――――

[6] I agree with JUSTICE BREYER that in interpreting an ambiguous
injunction we should give great weight to the interpretation of the
judge who issued it.  *Post*, at 3 (dissenting opinion).  But that does not
mean we must accept any construction a district court places upon an
order it has issued.  Here there is no reasonable reading of the original

\*     \*     \*

Keeping within the bounds of our constitutional authority often comes at a cost. Here, the litigants have lost considerable time and money disputing the merits, and we are forced to forgo an opportunity to clarify the law. But adhering to Article III's limits upon our jurisdiction respects the authority of those whom the people have chosen to make and carry out the laws. In this case Congress has determined that transferring the memorial to private hands best serves the public interest and complies with the Constitution, and the Executive defends that decision and seeks to carry it out. Federal courts have no warrant to revisit that decision—and to risk replacing the people's judgment with their own—unless and until a proper case has been brought before them. This is not it.

---

injunction that would bar the land transfer but would not also require the Government to ban "the display of the Latin cross" on *private* land "in the area of Sunrise Rock in the Mojave National Preserve," App. to Pet. for Cert. 146a—an implausible interpretation no one advocates.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–472

_____

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* FRANK BUONO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 28, 2010]

JUSTICE STEVENS, with whom JUSTICE GINSBURG and JUSTICE SOTOMAYOR join, dissenting.

In 2002 Congress designated a "five-foot-tall white cross" located in the Mojave National Preserve "as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war." Department of Defense Appropriations Act, Pub. L. 107–117, §8137(a), 115 Stat. 2278. Later that year, in a judgment not open to question, the District Court determined that the display of that cross violated the Establishment Clause because it "convey[ed] a message of endorsement of religion." *Buono* v. *Norton*, 212 F. Supp. 2d 1202, 1217 (CD Cal. 2002) *(Buono I)*. The question in this case is whether Congress' subsequent decision to transfer ownership of the property underlying the cross cured that violation.

"The Establishment Clause, if nothing else, prohibits government from 'specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the world are known to differ.'" *Van Orden* v. *Perry*, 545 U. S. 677, 718 (2005) (STEVENS, J., dissenting) (quoting *Lee* v. *Weisman*, 505 U. S. 577, 641 (1992) (SCALIA, J., dissenting)). A Latin cross necessarily symbolizes one of the most important tenets upon which believers in a benevolent Creator, as well as nonbelievers,

are known to differ. In my view, the District Court was right to enforce its prior judgment by enjoining Congress' proposed remedy—a remedy that was engineered to leave the cross intact and that did not alter its basic meaning. I certainly agree that the Nation should memorialize the service of those who fought and died in World War I, but it cannot lawfully do so by continued endorsement of a starkly sectarian message.

I

As the history recounted by the plurality indicates, this case comes to us in a procedural posture that significantly narrows the question presented to the Court. In the first stage of this litigation, the District Court and the Court of Appeals ruled that the Government violated the Establishment Clause by permitting the display of a single white Latin cross at Sunrise Rock. Those courts further ruled that the appropriate remedy was an injunction prohibiting the Government from "permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve." App. 39. The Government declined to seek a writ of certiorari following those rulings. Accordingly, for the purpose of this case, it is settled that "the Sunrise Rock cross will project a message of government endorsement [of religion] to a reasonable observer," *Buono* v. *Norton*, 371 F. 3d 543, 549 (CA9 2004) *(Buono II)*, and that the District Court's remedy for that endorsement was proper.

We are, however, faced with an additional fact: Congress has enacted a statute directing the Secretary of the Interior to transfer a 1-acre parcel of land containing the cross to the Veterans of Foreign Wars (VFW), subject to certain conditions, in exchange for a 5-acre parcel of land elsewhere in the Preserve. See Department of Defense Appropriations Act, 2004, Pub. L. 108–87, §8121, 117 Stat. 1100. The District Court found that the land transfer

under §8121 "violate[d] [the] court's judgment ordering a permanent injunction" and did not "actually cur[e] the continuing Establishment Clause violation." *Buono* v. *Norton*, 364 F. Supp. 2d 1175, 1182 (CD Cal. 2005) *(Buono III)*. The District Court therefore enforced its 2002 judgment by enjoining the transfer, without considering whether "the land transfer itself is an independent violation of the Establishment Clause." *Ibid.,* n. 8. Because the District Court did not base its decision upon an independent Establishment Clause violation, the constitutionality of the land-transfer statute is not before us. See *ante*, at 10. Instead, the question we confront is whether the District Court properly enforced its 2002 judgment by enjoining the transfer.

In answering that question we, like the District Court, must first consider whether the transfer would violate the 2002 injunction. We must then consider whether changed circumstances nonetheless rendered enforcement of that judgment inappropriate; or conversely whether they made it necessary for the District Court to bar the transfer, even if the transfer is not expressly prohibited by the prior injunction, in order to achieve the intended objective of the injunction. The plurality correctly notes that "'a court must never ignore significant changes in the law or circumstances underlying an injunction,'" *ante*, at 10 (quoting 11A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2961, pp. 393–394 (2d ed. 1995) (hereinafter Wright & Miller)), and "'[a] continuing decree of injunction directed to events to come is subject always to adaptation as events may shape the need,'" *ante*, at 14 (quoting *United States* v. *Swift & Co.*, 286 U. S. 106, 114 (1932)).[1] At the same time, it is axiomatic that when a

_____

[1] One point of contention: I accept as a general matter that a court must consider whether "legislative action has undermined the basis upon which relief has previously been granted." *Ante,* at 14. But the

party seeks to enforce or modify an injunction, the only circumstances that matter are *changed* circumstances. See *Swift*, 286 U. S*.,* at 119 ("The injunction, whether right or wrong, is not subject to impeachment in its application to the conditions that existed at its making").

I further accept that the District Court's task was to evaluate the changed circumstances "in light of the objectives of the 2002 injunction." *Ante*, at 16. This case does not simply pit a plaintiff's "prior showing of illegality" against a defendant's claim that "changed circumstances have rendered prospective relief inappropriate." *Ante*, at 14. That formulation implies that the changed circumstances all cut in one direction, against prospective relief, and that the defendant has asked the court to alleviate its obligations. But it is important to note that in this case, the Government did not move to "alleviate or eliminate conditions or restrictions imposed by the original decree" so as to permit the transfer. Wright & Miller §2961, at 397. Rather, it was the *beneficiary* of the original injunction who went back into court seeking its enforcement or modification in light of the transfer. Plainly, respondent had standing to seek enforcement of a decree in his favor.[2]

───────────

effect of the legislative action in this case is different from its effect in our cases espousing that principle, which stand for the proposition that if a *statutory* "right has been modified by the competent authority" since the decree, then an injunction enforcing the prior version of that right must be modified to conform to the change in the law. *Pennsylvania* v. *Wheeling & Belmont Bridge Co.*, 18 How. 421, 432 (1856); see also *Railway Employees* v. *Wright*, 364 U. S. 642, 651 (1961) ("In a case like this the District Court's authority to adopt a consent decree comes only from the statute which the decree is intended to enforce. . . . [I]t [must] be free to modify the terms of a consent decree when a change in law brings those terms in conflict with statutory objectives"). In a constitutional case such as this, legislative action may modify the facts, but it cannot change the applicable law.

[2] To the extent the Government challenges respondent's standing to seek the initial injunction, that issue is not before the Court for the reasons the plurality states. See *ante*, at 7. Moreover, in my view

Respondent argued that such action was necessary, either to enforce the plain terms of the 2002 injunction or to "achieve the purposes of the provisions of the decree," *United States* v. *United Shoe Machinery Corp.*, 391 U. S. 244, 249 (1968); see Wright & Miller §2961, at 393 ("[A] court must continually be willing to redraft the order at the request of the party who obtained equitable relief in order to insure that the decree accomplishes its intended result"). Only at that point did the Government argue that changed circumstances made prospective relief unnecessary. This difference in focus is a subtle one, but it is important to emphasize that the question that was before the District Court—and that is now before us—is whether enjoining the transfer was necessary to effectuate the letter or logic of the 2002 judgment.

Although I agree with the plurality's basic framework, I disagree with its decision to remand the case to the District Court. The District Court already "engage[d] in the appropriate inquiry," *ante*, at 10, and it was well within its rights to enforce the 2002 judgment. First, the District

———————

respondent has standing even under the analysis that JUSTICE SCALIA undertakes. It is not at all "speculative," *ante*, at 4 (opinion concurring in judgment), that the VFW will continue to display the cross. VFW Post 385, the beneficiary of the land transfer, has filed an *amici* brief in this case indicating it "intends to maintain and preserve the Veterans Memorial," Brief for Veterans of Foreign Wars of the United States et al. as *Amici Curiae* 4, by which it means the cross, *id.*, at 7 (identifying the Veterans Memorial as the "cross and plaque"). Respondent did, in his amended complaint, aver that he was offended specifically "by the display of a Latin Cross on government-owned property." App. 50. But his claimed injury is that he is "unable to freely use the area of the Preserve around the cross," *Buono* v. *Norton*, 371 F. 3d 543, 547 (CA9 2004) *(Buono II)* (internal quotation marks omitted), because the Government's unconstitutional endorsement of the cross will induce him to avoid the Sunrise Rock area, even though it offers the most convenient route to the Preserve, App. 65. That endorsement and respondent's resulting injury not only persist, but have been aggravated by the Government's actions since the complaint was filed.

Court properly recognized that the transfer was a means of "permitting"—indeed, encouraging—the display of the cross. The transfer therefore would violate the terms of the court's original injunction. Second, even if the transfer would not violate the terms of the 2002 injunction, the District Court properly took into account events that transpired since 2002 and determined that barring the transfer was necessary to achieve the intended result of the 2002 decree, as the transfer would not eliminate government endorsement of religion.

## II

The first step in the analysis is straightforward: The District Court had to ask whether the transfer of the property would violate the extant injunction. Under the terms of that injunction, the answer was yes.

The 2002 injunction barred the Government from "permitting the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve." App. 39. The land-transfer statute mandated transfer of the land to an organization that has announced its intention to maintain the cross on Sunrise Rock. That action surely "permit[s]" the display of the cross. See 11 Oxford English Dictionary 578 (2d ed. 1989) (defining "permit" as "[t]o admit or allow the doing or occurrence of; to give leave or opportunity for"). True, the Government would no longer exert direct control over the cross. But the transfer itself would be an act permitting its display.

I therefore disagree with JUSTICE SCALIA that the "only reasonable reading of the original injunction . . . is that it proscribed the cross's display on federal land." *Ante*, at 2 (opinion concurring in judgment). If the land were already privately owned, JUSTICE SCALIA may be correct that the cross' display on Sunrise Rock would not violate the injunction because the Government would not have to do anything to allow the cross to stand, and the Government

could try to prevent its display only by making such a display illegal. But the Government does own this land, and the transfer statute requires the Executive Branch to take an affirmative act (transfer to private ownership) designed to keep the cross in place. In evaluating a claim that the Government would impermissibly "permit" the cross' display by effecting a transfer, a court cannot start from a baseline in which the cross has *already* been transferred.

Moreover, §8121 was designed specifically to foster the display of the cross. Regardless of why the Government wanted to "accommodat[e]" the interests associated with its display, *ante*, at 13 (plurality opinion), it was not only foreseeable but also intended that the cross would remain standing. Indeed, so far as the record indicates, the Government had no other purpose for turning over this land to private hands. It was therefore proper for the District Court to find that the transfer would violate its 2002 injunction and to enforce that injunction against the transfer.

## III

As already noted, it was respondent, the beneficiary of the injunction, who moved the District Court for relief. When the beneficiary of an injunction seeks relief "to achieve the purposes of the provisions of the decree," *United Shoe Machinery Corp.*, 391 U. S., at 249, a district court has the authority to "modify the decree so as to achieve the required result with all appropriate expedition," *id.*, at 252. Thus, regardless of whether the transfer was prohibited by the plain terms of the 2002 judgment, the District Court properly inquired into whether enjoining the transfer was necessary to achieve the objective of that judgment. The Government faces a high burden in arguing the District Court exceeded its authority. A decree "may not be changed in the interests of the defen-

dants if the purposes of the litigation . . . have not been
fully achieved." *Id.*, at 248 (emphasis deleted). And con-
trary to the Government's position, the changed circum-
stances in this case support, rather than count against,
the District Court's enforcement decision.

The objective of the 2002 judgment, as the plurality
grudgingly allows, was to "avoi[d] the perception of gov-
ernmental endorsement" of religion. *Ante*, at 16; see
*Buono III*, 364 F. Supp. 2d, at 1178 (analyzing "'whether
government action endorsing religion has actually ceased'"
in light of the transfer). The parties do not disagree on
this point; rather, they dispute whether the transfer would
end government endorsement of the cross. Compare Brief
for Petitioners 21 ("Congress's transfer of the land . . .
ends any governmental endorsement of the cross") with
Brief for Respondent 34 ("[T]he government's endorsement
of the Christian cross is not remedied" by the land trans-
fer). The District Court rightly found that the transfer
would not end government endorsement of the cross.

A government practice violates the Establishment
Clause if it "either has the purpose or effect of 'endorsing'
religion." *County of Allegheny* v. *American Civil Liberties
Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 592
(1989). "Whether the key word is 'endorsement,' 'favorit-
ism,' or 'promotion,' the essential principle remains the
same. The Establishment Clause, at the very least, pro-
hibits government from appearing to take a position on
questions of religious belief or from 'making adherence to
a religion relevant in any way to a person's standing
in the political community.'" *Id.*, at 593–594 (quoting
*Lynch* v. *Donnelly*, 465 U. S. 668, 687 (1984) (O'Connor, J.,
concurring)).

The 2002 injunction was based on a finding that display
of the cross had the effect of endorsing religion. That is,
"the Sunrise Rock cross . . . project[s] a message of gov-
ernment endorsement [of religion] to a reasonable ob-

server." *Buono II*, 371 F. 3d, at 549. The determination that the Government had endorsed religion necessarily rested on two premises: first, that the Government endorsed the cross, and second, that the cross "take[s] a position on questions of religious belief" or "'mak[es] adherence to religion relevant . . . to a person's standing in the political community,'" *County of Allegheny*, 492 U. S., at 594. Taking the District Court's 2002 finding of an Establishment Clause violation as res judicata, as we must, the land transfer has the potential to dislodge only the first of those premises, in that the transfer might change the Government's endorsing relationship with the cross. As I explain below, I disagree that the transfer ordered by §8121 would in fact have this result. But it is also worth noting at the outset that the transfer statute could not (and does not) dislodge the second premise—that the cross conveys a religious message. Continuing government endorsement of the cross is thus continuing government endorsement of religion.

In my view, the transfer ordered by §8121 would not end government endorsement of the cross for two independently sufficient reasons. First, after the transfer it would continue to appear to any reasonable observer that the Government has endorsed the cross, notwithstanding that the name has changed on the title to a small patch of underlying land. This is particularly true because the Government has designated the cross as a national memorial, and that endorsement continues regardless of whether the cross sits on public or private land. Second, the transfer continues the existing government endorsement of the cross because the purpose of the transfer is to preserve its display. Congress' intent to preserve the display of the cross maintains the Government's endorsement of the cross.

The plurality does not conclude to the contrary; that is, it does not decide that the transfer would end government

endorsement of the cross and the religious message it
conveys. Rather, the plurality concludes that the District
Court did not conduct an appropriate analysis, and it
remands the case for a do-over. I take up each of the
purported faults the plurality finds in the District Court's
analysis in my examination of the reasons why the trans-
fer does not cure the existing Establishment Clause
violation.

*Perception of the Cross Post-Transfer*

The 2002 injunction was based upon a finding of im-
permissible effect: The "Sunrise Rock cross . . . project[s] a
message of government endorsement [of religion] to a
reasonable observer." *Buono II*, 371 F. 3d, at 549. The
transfer would not end that impermissible state of affairs
because the cross, post-transfer, would still have "the
effect of communicating a message of government en-
dorsement . . . of religion." *Lynch*, 465 U. S., at 692
(O'Connor, J., concurring). As the Court of Appeals cor-
rectly found, "[n]othing in the present posture of the case
alters" the conclusion that a "reasonable observer would
perceive governmental endorsement of the message" the
cross conveys. *Buono* v. *Kempthorne*, 527 F. 3d 758, 783
(CA9 2008) *(Buono IV)*.[3]

———————

[3]The plurality faults the District Court for not engaging in this
analysis, but the District Court did implicitly consider how a reason-
able observer would perceive the cross post-transfer when it analyzed
the terms of the transfer, the Government's continuing property rights
in the conveyed land, and the history of the Government's efforts to
preserve the cross. Furthermore, the Court of Appeals affirmed the
District Court's order on the express ground that a reasonable observer
would still perceive government endorsement of the cross. See *Buono
IV*, 527 F. 3d, at 782–783.

THE CHIEF JUSTICE suggests this is much ado about nothing because
respondent's counsel conceded that the injunction would not be violated
were the Government to have gone through an "empty ritual" of taking
down the cross before transferring the land. *Ante*, at 1 (concurring
opinion). But in the colloquy to which THE CHIEF JUSTICE refers,

STEVENS, J., dissenting

In its original judgment, the Court of Appeals found that a well-informed reasonable observer would perceive government endorsement of religion, notwithstanding the cross' initial "placement by private individuals," based upon the following facts: "that the cross rests on public land[,] . . . that Congress has designated the cross as a war memorial and prohibited the use of funds to remove it, and that the Park Service has denied similar access for expression by an adherent of the . . . Buddhist faith." *Buono II*, 371 F. 3d, at 550. After the transfer, a well-informed observer would know that the cross was no longer on public land, but would additionally be aware of the following facts: The cross was once on public land, the Government was enjoined from permitting its display, Congress transferred it to a specific purchaser in order to preserve its display in the same location, and the Government maintained a reversionary interest in the land. From this chain of events, in addition to the factors that remain the same after the transfer, he would perceive government endorsement of the cross.[4]

_____

counsel assumed that the Government would not retain a reversionary interest in the land, and that the cross would not retain its designation as a national memorial. See Tr. of Oral Arg. 44–45. Even under THE CHIEF JUSTICE's revised version of the hypothetical, I would not so quickly decide that taking down the cross makes no material difference. And counsel's statement takes no position as to whether the hypothetical poses any constitutional problem independent of the injunction. Regardless, we must deal with the substance of the case before us, which involves much more than Congress directing the Government to execute a simple land transfer.

[4] A less informed reasonable observer, see *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 807 (1995) (STEVENS, J., dissenting), would reach the same conclusion because the cross would still appear to stand on Government property. The transfer merely "carv[es] out a tiny parcel of property in the midst of this vast Preserve—like a donut hole with the cross atop it." *Buono* v. *Kempthorne*, 527 F. 3d 758, 783 (CA9 2008). For any reasonable observer, then, the transfer simply would not change the effect of the cross.

Particularly important to this analysis is that although the transfer might remove the implicit endorsement that presence on public land signifies, see *Capitol Square Review and Advisory Bd.* v. *Pinette*, 515 U. S. 753, 801 (1995) (STEVENS, J., dissenting) ("The very fact that a sign is installed on public property implies official recognition and reinforcement of its message"), it would not change the fact that the Government has taken several explicit actions to endorse this cross. In its decision upholding the initial entry of the injunction, the Court of Appeals found those actions contributed to a reasonable observer's perception of government endorsement. *Buono II*, 371 F. 3d, at 550. Their significance does not depend upon the ownership of the land.

In 2000, and again after the District Court had entered its initial injunction, Congress passed legislation prohibiting the use of any federal funds to remove the cross from its location on federal property. See Consolidated Appropriations Act, 2001, Pub. L. 106–554, App. D, §133, 114 Stat. 2763A–230; Department of Defense Appropriations Act, 2003, Pub. L. 107–248, §8065(b), 116 Stat. 1551. Thus, beyond merely acquiescing in the continued presence of a cross on federal property, Congress singled out that cross for special treatment, and it affirmatively commanded that the cross must remain.

Congress also made a more dramatic intervention. Without the benefit of any committee hearings or floor debate in either the Senate or the House of Representatives—indeed, without a moment of discussion in any official forum—Congress passed legislation officially designating the "five-foot-tall white cross" in the Mojave Desert "as a national memorial commemorating United States participation in World War I and honoring the American veterans of that war." §8137(a), 115 Stat. 2278. Thereafter, the cross was no longer just a local artifact; it acquired a formal national status of the highest order.

Once that momentous step was taken, changing the identity of the owner of the underlying land could no longer change the public or private character of the cross. The Government has expressly adopted the cross as its own.[5]

Even though Congress recognized this cross for its military associations, the solitary cross conveys an inescapably sectarian message. See *Separation of Church and State Comm.* v. *Eugene*, 93 F. 3d 617, 626 (CA9 1996) (O'Scannlain, J., concurring in result) ("[T]he City's use of a cross to memorialize the war dead may lead observers to believe that the City has chosen to honor only Christian veterans"). As the District Court observed, it is undisputed that the "[L]atin cross is the preeminent symbol of Christianity. It is exclusively a Christian symbol, and not a symbol of any other religion." *Buono I*, 212 F. Supp. 2d, at 1205. We have recognized the significance of the Latin cross as a sectarian symbol,[6] and no participant in this

_____

[5] The plurality barely mentions this designation, except to assert that the designation gave recognition to the historical meaning of the cross. See *ante*, at 12. But the plurality does not acknowledge that when the Ninth Circuit affirmed the 2002 judgment, it concluded that the designation is one of the factors that would lead a reasonable observer to perceive government endorsement of religion. See *Buono II*, 371 F. 3d, at 550. Nor does the plurality address the effect of that designation on a reasonable observer's perception of the cross, regardless of whether the cross sits on private land. See *ante*, at 16.

[6] See*, e.g.*, *Pinette,* 515 U. S., at 760 (characterizing Ku Klux Klan-sponsored cross as religious speech); *id.*, at 776 (O'Connor, J., concurring in part and concurring in judgment) ("[T]he cross is an especially potent sectarian symbol"); *id.*, at 792 (Souter, J., concurring in part and concurring in judgment) ("[T]he Latin cross . . . is the principal symbol of Christianity around the world, and display of the cross alone could not reasonably be taken to have any secular point"); *id.*, at 798, n. 3 (STEVENS, J., dissenting) ("[T]he Latin cross is identifiable as a symbol of a particular religion, that of Christianity; and, further, as a symbol of particular denominations within Christianity"); *County of Allegheny* v. *American Civil Liberties Union, Greater Pittsburgh Chapter*, 492 U. S. 573, 661 (1989) (KENNEDY, J., concurring in judgment in part and dissenting in part) ("[T]he [Establishment] Clause forbids a city to

litigation denies that the cross bears that social meaning.
Making a plain, unadorned Latin cross a war memorial
does not make the cross secular.  It makes the war memo-
rial sectarian.[7]

More fundamentally, however, the message conveyed by
the cross is not open to reconsideration given the posture
of this case.  The plurality employs a revealing turn of
phrase when it characterizes the cross as "a symbol that,
while challenged under the Establishment Clause, has
complex meaning beyond the expression of religious
views."  *Ante*, at 13.  The days of considering the cross
itself as *challenged* under the Establishment Clause are
over; it is settled that the Government is not permitted to
endorse the cross.  However complex the meaning of the
cross, the Court of Appeals in 2004 considered and re-
jected the argument that its dual symbolism as a war
memorial meant that government endorsement of the
cross did not amount to endorsement of religion.  See
*Buono II*, 371 F. 3d, at 549, n. 5.  All we are debating at

_____

permit the permanent erection of a large Latin cross on the roof of city
hall . . . because such an obtrusive year-round religious display would
place the government's weight behind an obvious effort to proselytize
on behalf of a particular religion").

[7] Context is critical to the Establishment Clause inquiry, and not
every use of a religious symbol in a war memorial would indicate
government endorsement of a religious message.  See*, e.g., Van Orden*
v. *Perry*, 545 U. S. 677, 701 (2005) (BREYER, J., concurring in judgment)
("[T]o determine the message that the text here conveys, we must
examine how the text is *used*.  And that inquiry requires us to consider
the context of the display"); *County of Allegheny*, 492 U. S., at 598
("[T]he effect of a crèche display turns on its setting"); *Lynch* v. *Don-
nelly*, 465 U. S. 668, 694 (1984) (O'Connor, J., concurring) ("Every
government practice must be judged in its unique circumstances to
determine whether it constitutes an endorsement or disapproval of
religion").  But this cross is not merely one part of a more elaborate
monument that, taken as a whole, may be understood to convey a
primarily nonreligious message.  Rather, the cross is the only symbol
conveying any message at all.

this juncture is whether the shift from public to private ownership of the land sufficiently distanced the Government from the cross; we are no longer debating the message the cross conveys to a reasonable observer. In arguing that Congress can legitimately favor the cross because of its purported double meaning, the plurality implicitly tries to reopen what is closed.[8]

The plurality also poses a different objection to consideration of whether the transfer would change a reasonable observer's perception of the cross. The plurality suggests that the "'reasonable observer' standard" may not "be the appropriate framework" because "courts considering Establishment Clause challenges do not," as a general matter, "inquire into 'reasonable observer' perceptions with respect to objects on private land." *Ante*, at 16. Once again, the plurality's approach fails to pay heed to the posture of this case.

At the risk of stating the obvious, respondent is not simply challenging a private object on private land. Although "an Establishment Clause violation must be moored in government action of some sort," *Pinette*, 515 U. S., at 779 (O'Connor, J., concurring in part and concur-

---

[8] The plurality's assertions regarding the meaning of the cross are therefore beside the point. For the record, however, I cannot agree that a bare cross such as this conveys a nonsectarian meaning simply because crosses are often used to commemorate "heroic acts, noble contributions, and patient striving" and to honor fallen soldiers. *Ante*, at 17. The cross is not a universal symbol of sacrifice. It is the symbol of one particular sacrifice, and that sacrifice carries deeply significant meaning for those who adhere to the Christian faith. The cross has sometimes been used, it is true, to represent the sacrifice of an individual, as when it marks the grave of a fallen soldier or recognizes a state trooper who perished in the line of duty. Even then, the cross carries a religious meaning. But the use of the cross in such circumstances is linked to, and shows respects for, the individual honoree's faith and beliefs. I, too, would consider it tragic if the Nation's fallen veterans were to be forgotten. See *ibid*. But there are countless different ways, consistent with the Constitution, that such an outcome may be averted.

ring in judgment), respondent's objection to the transfer
easily meets that test for two reasons. First, he is cur-
rently challenging official legislation, taken in response to
an identified Establishment Clause violation. That legis-
lation would transfer public land to a particular private
party, with the proviso that the transferee must use the
land to fulfill a specific public function or else the land
reverts back to the Government. Second, even once the
transfer is complete, the cross would remain a national
memorial. The cross is therefore not a purely "private"
object in any meaningful sense.

Notwithstanding these facts, the plurality appears to
conclude that the transfer might render the cross purely
private speech. It relies in part on the plurality opinion in
*Pinette* for its suggestion that the reasonable observer
standard may not be apposite, and *Pinette* addressed a
privately owned cross displayed in a public forum. The
*Pinette* plurality would have rejected the idea that "a
neutrally behaving government" can ever endorse "*private*
religious expression," *id.*, at 764, even if a reasonable
observer would perceive government endorsement, *id.*, at
768. But the *Pinette* plurality acknowledged that govern-
ment favoritism of private religious speech is unconstitu-
tional, as when a government "giv[es] sectarian religious
speech preferential access to a forum close to the seat of
government (or anywhere else for that matter)." *Id.,* at
766. And in this case, the Government is not acting neu-
trally: The transfer statute and the government actions
preceding it have all favored the cross.

Furthermore, even assuming (wrongly) that the cross
would be purely private speech after the transfer, and
even assuming (quite implausibly) that the transfer stat-
ute is neutral with respect to the cross, it would still be
appropriate for the District Court to apply the reasonable
observer standard. The majority of the *Pinette* Court
rejected the *per se* rule proposed by the plurality. Instead,

the relevant standard provides that the Establishment Clause is violated whenever "the State's own actions . . . , and their relationship to the private speech at issue, *actually convey* a message of endorsement." *Id.*, at 777 (O'Connor, J., concurring in part and concurring in judgment). Moreover, the Establishment Clause "imposes affirmative obligations that may require a State, in some situations, to take steps to avoid being perceived as supporting or endorsing a private religious message." *Ibid.* It is particularly appropriate in this context—when the issue is whether the transfer cures an already identified Establishment Clause violation—for the District Court to consider whether the Government, by complying with §8121, would have taken sufficient steps to avoid being perceived as endorsing the cross.

As I explained at the outset of this section, the answer to that inquiry is surely no. The reasonable observer "who knows all of the pertinent facts and circumstances surrounding the symbol and its placement," *ante*, at 17, would perceive that the Government has endorsed the cross: It prohibited the use of federal funds to take down the cross, designated the cross as a national memorial, and engaged in "herculean efforts to preserve the Latin cross" following the District Court's initial injunction, *Buono III*, 364 F. Supp. 2d, at 1182. Those efforts include a transfer statute designed to keep the cross in place. Changing the ownership status of the underlying land in the manner required by §8121 would not change the fact that the cross conveys a message of government endorsement of religion.

*Purpose in Enacting the Transfer Statute*

Even setting aside that the effect of the post-transfer cross would still be to convey a message of government endorsement of religion, the District Court was correct to conclude that §8121 would not cure the Establishment Clause violation because the very purpose of the transfer

was to preserve the display of the cross. That evident
purpose maintains government endorsement of the cross.
The plurality does not really contest that this was Con-
gress' purpose, *ante*, at 11, so I need not review the evi-
dence in great detail. Suffice it to say that the record
provides ample support. The land-transfer statute author-
izes a conveyance to the particular recipient that has
expressed an intent to preserve the cross. See Brief for
Veterans of Foreign Wars of the United States et al. as
*Amici Curiae* 4 (transfer recipient "intends to maintain
and preserve the Veterans Memorial"); *id.*, at 7 (identify-
ing Veterans Memorial as the "cross and plaque"). And it
conveys the particular land that has already been desig-
nated "as a national memorial" commemorating the veter-
ans of World War I, §8121(a), 117 Stat. 1100, subject to a
reversionary clause requiring that a memorial "commemo-
rating United States participation in World War I and
honoring the American veterans of that war" be main-
tained, §8121(e). If it does not categorically require the
new owner of the property to display the existing memo-
rial meeting that description (the cross), see §8137, 115
Stat. 2278, the statute most certainly encourages this
result. Indeed, the Government concedes that Congress
sought to "*preserve* a longstanding war memorial" at the
site, Brief for Petitioners 28 (emphasis added), and the
only memorial that could be "preserved" at Sunrise Rock is
the cross itself.

    The plurality insists, however, that even assuming the
purpose of the land transfer was to preserve the display of
the cross, enjoining the transfer was not necessarily ap-
propriate. It contends the District Court failed to give
adequate consideration to "the context in which the [land-
transfer] statute was enacted and the reasons for its pas-
sage," *ante*, at 11, and it directs the District Court's atten-
tion to three factors: the message intended by the private
citizens who first erected the cross, *ibid.;* the time the

cross stood on Sunrise Rock and its historical meaning, *ante*, at 11–12; and Congress' balancing of "opposing interests" and selection of a "policy of accommodation," *ante*, at 13; see also *ante*, at 17.

The first two of these factors are red herrings. The District Court, in its enforcement decision, had no occasion to consider anew either the private message intended by those who erected the cross or how long the cross had stood atop Sunrise Rock. Neither of these factors constituted a novel or changed circumstance since the entry of the 2002 injunction. Whatever message those who initially erected the cross intended—and I think we have to presume it was a Christian one, at least in part, for the simple reason that those who erected the cross chose to commemorate American veterans in an explicitly Christian manner—that historical fact did not change between 2002 and 2005. I grant that the amount of time the cross had stood on Sunrise Rock did change, from 68 years to 71 years, but no one can seriously maintain that "the historical meaning that the cross had attained," *ante*, at 12, was materially transformed in that 3-year increment.[9]

————————

[9] I also disagree with the plurality's factual premise that "the cross and the cause it commemorated had become entwined in the public consciousness" in a secular manner, *ante*, at 11–12. Although some members of the community knew that the cross had been originally erected as a war memorial, there is no support in the record for the idea that members of the public "gathered regularly at Sunrise Rock to pay their respects," *ibid.*, to the fallen of World War I or any other veterans. The study conducted by a National Park Service historian indicates that a group of veterans gathered at the cross as early as 1935 for Easter sunrise services. Memorandum from Mark Luellen to Superintendent, Mojave National Preserve (Jan. 31, 2000), Decl. of Peter J. Eliasberg in *Buono* v. *Norton*, No. EDCV 01–216–RT (CD Cal., Mar. 13, 2002), p. 20 (Exh. 7). But there is no evidence that gatherings were ever held for Armistice Day or Veterans Day. The study further reveals that a local club organized social events for the community at the cross from 1950 to 1975 and that after a local veteran passed away in 1984, the "memory and associations of the white cross . . . as a war memorial"

This brings us to the final factor identified by the plurality: Congress' "policy of accommodation" for the cross.[10]  Of course, the District Court did consider Congress' "policy" in the sense that it considered the result Congress was trying to achieve with respect to the cross, *i.e.*, to keep it in place.  See *Buono III*, 364 F. Supp. 2d, at 1182 ("[T]he proposed transfer of the subject property can only be viewed as an attempt to keep the Latin cross atop Sunrise Rock without actually curing the continuing Establishment Clause violation").  But I understand the plurality to be faulting the District Court for failing to inquire into a deeper level of motivation: If the purpose of the transfer was to keep the cross in place, what was the purpose of keeping the cross in place?

I do not see why it was incumbent upon the District Court to examine this second-order purpose when determining whether the transfer violated the 2002 injunction. As discussed in Part II, *supra*, the injunction barred the Government from permitting the display of the cross, which fairly encompasses any act providing an opportunity for the cross' display.  It was entirely appropriate for the District Court to characterize a transfer with the purpose of preserving the cross as an attempt to evade that injunction, and to find that the Government's purpose to preserve the cross maintains government endorsement of the cross.

————————

faded but locals were "inspired . . . to reinstate the Easter sunrise services" at the cross.  *Ibid.*

[10] Although the plurality uses the term "accommodation," I do not read its opinion to suggest that Congress' policy vis-à-vis the cross has anything to do with accommodating any individual's religious practice. Cf. *County of Allegheny*, 492 U. S., at 601, n. 51 ("Nor can the display of the crèche be justified as an 'accommodation' of religion. . . . To be sure, prohibiting the display . . . deprives Christians of the satisfaction of seeing the government adopt their religious message as their own, but this kind of government affiliation with particular religious messages is precisely what the Establishment Clause precludes").

The plurality would have the District Court revise its entire analysis of whether the transfer would end government endorsement, in light of the plurality's view of the land-transfer statute's putative second-order purpose. That analysis ignores the procedural posture of the case. If the question before the Court were whether §8121 itself violated the Establishment Clause, then this argument might have merit. But we are instead examining whether action taken with the purpose of preserving the display of the cross cures or continues government endorsement. In my view, that purpose continues the impermissible endorsement of—indeed, favoritism toward—the cross, regardless of *why* Congress chose to intervene as it did.

In any event, Congress' second-order purpose does little for the plurality's position. Without relying on any legislative history or findings—there are none—the plurality opines that Congress wanted to keep the cross in place in order to accommodate those who might view removal as "conveying disrespect for those the cross was seen as honoring," *ante*, at 12, and it suggests that this decision was an acceptable method of "balanc[ing] opposing interests" because the cross "has complex meaning beyond the expression of religious views," *ante*, at 13. As I have already explained, the meaning of the cross (complex or otherwise) is no longer before us, and the plurality's reliance on a "congressional statement of policy," *ibid.*, as negating any government endorsement of religion finds no support in logic or precedent. The cross cannot take on a nonsectarian character by congressional (or judicial) fiat, and the plurality's evaluation of Congress' actions is divorced from the methodology prescribed by our doctrine.[11]

---

[11] JUSTICE ALITO similarly affords great weight to Congress' purported interest in "avoiding the disturbing symbolism associated with the destruction of the historic monument." *Ante*, at 5 (opinion concurring in part and concurring in judgment). But we surely all can agree that once the government has violated the Establishment Clause, as has

Our precedent provides that we evaluate purpose based
upon what the objective indicia of intent would reveal to a
reasonable observer. See *McCreary County* v. *American
Civil Liberties Union of Ky.,* 545 U. S. 844, 862 (2005)
("The eyes that look to purpose belong to an objective
observer, one who takes account of the traditional external
signs that show up in the text, legislative history, and
implementation of the statute, or comparable official act"
(internal quotation marks omitted)). "[R]easonable ob-
servers have reasonable memories, and our precedents
sensibly forbid an observer 'to turn a blind eye to the
context in which [the] policy arose.'" *Id.*, at 866 (quoting
*Santa Fe Independent School Dist.* v. *Doe*, 530 U. S. 290,
315 (2000)). The plurality nowhere engages with how a
reasonable observer would view Congress' "policy of ac-
commodation" for this cross. Instead, the plurality insists
that deference is owed because of "Congress's prerogative
to balance opposing interests and its institutional compe-
tence to do so." *Ante*, at 13.

The proper remedy for an Establishment Clause viola-
tion is a legal judgment, which is not the sort of issue for
which Congress "'has both wisdom and experience . . . that

_____

been adjudged in this case and is now beyond question, a plaintiff must
be afforded a complete remedy. That remedy may sometimes require
removing a religious symbol, and regrettably some number of people
may perceive the remedy as evidence that the government "is bent on
eliminating from all public places and symbols any trace of our coun-
try's religious heritage," *ante*, at 4. But it does not follow that the
government can decline to cure an Establishment Clause violation in
order to avoid offense. It may be the case that taking down the symbol
is not the only remedy. The proper remedy, like the determination of
the violation itself, is necessarily context specific, and even if it involves
moving the cross, it need not involve the "demolition" or "destruction" of
the cross, see *ante*, at 4, 5. Regardless, in this case the only question
before us is whether this particular transfer provided a complete
remedy. We have no way of knowing whether Congress' motivation
was to minimize offense, but in any event that interest does not amelio-
rate the remedial ineffectiveness of §8121.

is far superior to ours.'" *Citizens United* v. *FEC*, 558 U. S. \_\_\_, \_\_\_ (2010) (STEVENS, J., dissenting) (slip op., at 71) (quoting *Colorado Republican Federal Campaign Comm.* v. *FEC*, 518 U. S. 604, 650 (1996) (STEVENS, J., dissenting)). Moreover, the inference that Congress has exercised its institutional competence—or even its considered judgment—is significantly weaker in a case such as this, when the legislative action was "buried in a defense appropriations bill," *Buono III,* 364 F. Supp. 2d, at 1181, and, so far as the record shows, undertaken without any deliberation whatsoever. I am not dismissive of Congress, see *ante*, at 7 (opinion of ALITO, J.), but §8121 presents no factual findings, reasoning, or long history of "'careful legislative adjustment,'" *Citizens United*, 558 U. S., at \_\_\_ (STEVENS, J., dissenting) (slip op., at 71) (quoting *FEC* v. *Beaumont*, 539 U. S. 146, 162, n. 9 (2003)), to which I could possibly defer. Congress did not devote "years of careful study" to §8121, *Citizens United*, 558 U. S., at \_\_\_ (STEVENS, J., dissenting) (slip op., at 73), nor did it develop a record of any kind, much less an exhaustive one, see *id.*, at \_\_\_ (slip op., at 20) (noting the legislative record for the Bipartisan Campaign Reform Act of 2002 spanned 100,000 pages). The concurrence's attempt to draw an equivalence between a provision tucked silently into an appropriations bill and a major statute debated and developed over many years is, to say the least, not persuasive. All legislative acts are not fungible.

Furthermore, in the Establishment Clause context, we do not accord any special deference to the legislature on account of its generic advantages as a policymaking body, and the purpose test is not "satisfied so long as *any* secular purpose for the government action is apparent," *McCreary County*, 545 U. S., at 865, n. 13 (emphasis added). Nor can the Government pursue a secular aim through religious means. See *Van Orden*, 545 U. S., at 715 (STEVENS, J., dissenting) ("Though the State of Texas

may genuinely wish to combat juvenile delinquency, and
may rightly want to honor the Eagles for their efforts, it
cannot effectuate these admirable purposes through an
explicitly religious medium"). It is odd that the plurality
ignores all of these well-settled principles in exalting this
particular legislative determination.

A reasonable observer, considering the nature of this
symbol, the timing and the substance of Congress' efforts,
and the history of the Sunrise Rock site, could conclude
that Congress chose to preserve the cross primarily be-
cause of its salience as a cross. Cf. *McCreary County*, 545
U. S., at 873 ("If the observer had not thrown up his
hands, he would probably suspect that the Counties were
simply reaching for any way to keep a religious document
on the walls . . ."). But no such conclusion is necessary to
find for respondent.[12] The religious meaning of the cross
was settled by the 2002 judgment; the only question before
us is whether the Government has sufficiently distanced
itself from the cross to end government endorsement of it.
At the least, I stress again, a reasonable observer would
conclude that the Government's purpose in transferring
the underlying land did not sufficiently distance the Gov-
ernment from the cross. Indeed, §8121 evidenced concern
for whether the cross would be displayed. The District
Court was therefore correct to find that the transfer would

———————

[12] I have not "jump[ed] to the conclusion that Congress' aim in enact-
ing the land transfer law was to embrace the religious message of the
cross." *Ante*, at 7 (opinion of ALITO, J.). I think a reasonable observer
could come to that conclusion, but my point is that so long as we agree
that Congress' aim was to preserve the cross (which JUSTICE ALITO does
not dispute), Congress' reason for preserving the cross does not matter.
But if we were debating whether Congress had a religious purpose in
passing the transfer statute, I would contest the relevance of the vote
count to that inquiry, see *ante*, at 6, and particularly so in this case.
One cannot infer much of anything about the land-transfer provision
from the fact that an appropriations bill passed by an overwhelming
majority.

STEVENS, J., dissenting

not end government endorsement of religion.

IV

In sum, I conclude that the transfer ordered by §8121 will not end the pre-existing government endorsement of the cross, and to the contrary may accentuate the problem in some respects. Because the transfer would perpetuate the Establishment Clause violation at issue in the 2002 injunction, I further conclude that enjoining the transfer was necessary to secure relief. Given the transfer statute's fundamental inadequacy as a remedy, there was— and is—no need for the District Court to consider "less drastic relief than complete invalidation of the . . . statute." *Ante,* at 18. Allowing the transfer to go forward would interfere with the District Court's authority to enforce its judgment and deprive the District Court of the ability to ensure a complete remedy. Nor could allowing the transfer to go forward be made a complete remedy with add-on measures, such as signs or fences indicating the ownership of the land. Such measures would not completely end the government endorsement of this cross, as the land would have been transferred in a manner favoring the cross and the cross would remain designated as a national memorial. Enjoining compliance with §8121 was therefore a proper exercise of the District Court's authority to enforce the 2002 judgment.

\*    \*    \*

Congressional action, taken after due deliberation, that honors our fallen soldiers merits our highest respect. As far as I can tell, however, it is unprecedented in the Nation's history to designate a bare, unadorned cross as the national war memorial for a particular group of veterans. Neither the Korean War Memorial, the Vietnam War Memorial, nor the World War II Memorial commemorates our veterans' sacrifice in sectarian or predominantly religious ways. Each of these impressive structures pays

equal respect to all members of the Armed Forces who perished in the service of our Country in those conflicts. In this case, by contrast, a sectarian symbol *is* the memorial. And because Congress has established no other national monument to the veterans of the Great War, this solitary cross in the middle of the desert is *the* national World War I memorial. The sequence of legislative decisions made to designate and preserve a solitary Latin cross at an isolated location in the desert as a memorial for those who fought and died in World War I not only failed to cure the Establishment Clause violation but also, in my view, resulted in a dramatically inadequate and inappropriate tribute.

I believe that most judges would find it to be a clear Establishment Clause violation if Congress had simply directed that a solitary Latin cross be erected on the Mall in the Nation's Capital to serve as a World War I Memorial. Congress did not erect this cross, but it commanded that the cross remain in place, and it gave the cross the imprimatur of Government. Transferring the land pursuant to §8121 would perpetuate rather than cure that unambiguous endorsement of a sectarian message.

The Mojave Desert is a remote location, far from the seat of our Government. But the Government's interest in honoring all those who have rendered heroic public service regardless of creed, as well as its constitutional responsibility to avoid endorsement of a particular religious view, should control wherever national memorials speak on behalf of our entire country.

I respectfully dissent.

# SUPREME COURT OF THE UNITED STATES

_____

No. 08–472

_____

## KEN L. SALAZAR, SECRETARY OF THE INTERIOR, ET AL., PETITIONERS *v.* FRANK BUONO

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[April 28, 2010]

JUSTICE BREYER, dissenting.

The District Court in this case entered a permanent injunction forbidding the Government to "permi[t] the display of the Latin cross in the area of Sunrise Rock in the Mojave National Preserve." App. 39. Subsequently, Government authorities covered the cross with a plywood box so that it could not be seen. Congress then enacted a statute directing the Secretary of the Interior to convey to a private entity approximately one acre of land upon which the cross stood, presumably so that the cross could be displayed uncovered. The plaintiff, returning to the District Court, asked that court to "'hold that the transfer violates the . . . injunction.'" *Buono* v. *Norton*, 364 F. Supp. 2d 1175, 1177 (CD Cal. 2005) (quoting plaintiff's motion). The court held that it did. *Id.,* at 1182. And the question before us is whether the law permits the District Court so to interpret its injunction.

To answer this question we need not address any significant issue of Establishment Clause law. Because the Government has already lost the case, taken an appeal, and lost the appeal, we must take as a given the lower court's resolution of the Establishment Clause question before the land transfer. That is to say, as the plurality points out, *ante*, at 9, we must here assume that the original display of the cross violated the Constitution because

"the presence of the cross on federal land conveys a message" to a "reasonable observer" of governmental "endorsement of religion." *Buono* v. *Norton*, 212 F. Supp. 2d 1202, 1216–1217 (CD Cal. 2002). See *Travelers Indemnity Co.* v. *Bailey*, 557 U. S. ___, ___ (2009) (slip op., at 14) (once orders become final on direct review, they are res judicata to the parties). For the same reason, we must here assume that the plaintiff originally had standing to bring the lawsuit. *Ante*, at 7; see also *ante*, at 1 (SCALIA, J., concurring in judgment); *Travelers*, *supra*, at ___ (slip op., at 14) (orders are no less preclusive when the collateral attack is jurisdictional). And, as the plurality also points out, the plaintiff consequently has standing now to seek enforcement of the injunction. *Ante*, at 8–9; see also *Allen* v. *Wright*, 468 U. S. 737, 763 (1984).

Moreover, we are not faced with the question whether changed circumstances require modification of the injunction. The Government did not ask the District Court to modify it. In fact, the Government did not ask the District Court for any relief at all. Rather, it was the plaintiff who asked the District Court either (1) to "'hold that the [land] transfer violates the current injunction,'" or (2) to "'modify that injunction to prohibit the land transfer because it violates the Establishment Clause.'" 364 F. Supp. 2d, at 1177 (quoting plaintiff's motion). The District Court did the former, *i.e.*, it interpreted the injunction as prohibiting the Government from transferring the land for purposes of displaying the cross. And having granted the plaintiff's request to enforce the injunction, it dismissed the plaintiff's alternative request to modify the injunction as moot.

Thus, as I said at the outset, the only question before us is whether the law permits the District Court to hold that the land transfer (presumably along with the subsequent public display of the cross) falls within the scope of its original injunctive order, an order that says the Government must not "permi[t] the display of the Latin cross in

the area of Sunrise Rock in the Mojave National Pre-
serve." App. 39. In my view the law authorizes the Dis-
trict Court to do so.

The legal principles that answer the question presented
are found not in the Constitution but in cases that concern
the law of injunctions. First, the law of injunctions grants
a district court considerable leeway to interpret the mean-
ing and application of its own injunctive order. Members
of this Court have written that the "construction given to"
an "injunction by the issuing judge . . . is entitled to great
weight." *Madsen* v. *Women's Health Center, Inc.*, 512 U. S.
753, 795 (1994) (SCALIA, J., concurring in judgment in part
and dissenting in part). And the Courts of Appeals have
consistently held that district courts have considerable
discretion in interpreting and applying their own injunc-
tive decrees. See, *e.g., JTH Tax, Inc.* v. *H & R Block East-
ern Tax Servs., Inc.*, 359 F. 3d 699, 705 (CA4 2004); *Ala-
bama Nursing Home Assn* v. *Harris*, 617 F. 2d 385, 388
(CA5 1980). This principle is longstanding and well estab-
lished, as reflected in a prominent treatise writer's sum-
mary of the case law: "The court granting the injunction is
necessarily invested with large discretion in enforcing
obedience to its mandate, and . . . courts of appellate
powers are exceedingly averse to interfering with the
exercise of such judgment and discretion." 2 J. High, Law
of Injunctions §1458, pp. 1467–1468 (4th ed. 1905).

Second, a court should construe the scope of an injunc-
tion in light of its purpose and history, in other words,
"what the decree was really designed to accomplish."
*Mayor of Vicksburg* v. *Henson*, 231 U. S. 259, 273 (1913).
Courts have long looked to "the objects for which the
[injunctive] relief was granted, as well as the circum-
stances attending it," in deciding whether an enjoined
party has complied with an injunction. 2 High, *supra,*
§1446, at 1455, and n. 68 (citing cases); see also *John B.
Stetson Co.* v. *Stephen L. Stetson Co.*, 128 F. 2d 981, 983

(CA2 1942). And they have long refused to "permit defendants to evade responsibility for violating an injunction, by doing through subterfuge a thing which is not in terms a violation, yet produces the same effect by accomplishing substantially that which they were enjoined from doing." *Stodder* v. *Rosen Talking Mach. Co.*, 247 Mass. 60, 68, 141 N. E. 569, 571 (1923).

These two principles adequately support the District Court's interpretation and application of the injunctive language at issue here. As an initial matter, the plain text of the injunction is reasonably read to prohibit the transfer. Right now, the cross is covered with a plywood box; after the transfer, the box will be removed and the cross will be displayed. The transfer thus "permits" the public "display" of the cross. Indeed, that is the statute's objective.

Consideration of the injunction's purpose points in the same direction. The injunction rested upon the District Court's determination that the display of the cross "conveys a message of endorsement of religion" to "a reasonable observer" in violation of the Establishment Clause. 212 F. Supp. 2d, at 1216–1217. (As I have said, for present purposes we must assume that this is so.) The purpose of the injunction is to prevent the conveyance of such a message to the reasonable observer.

With that purpose in mind, consider the following facts that confronted the District Court when the plaintiff asked it to enforce the decree:

- The Government had designated the "white cross . . . as well as a limited amount of adjoining [land]" as a national memorial. Pub. L. 107–117, §8137(a), 115 Stat. 2278–2279.
- The new statute directed the transfer of the "property . . . designated . . . as a national memorial" to a private entity with an interest in maintaining the

cross in its current location, in exchange for a par-
cel of land located elsewhere in the Preserve owned
by private individuals who have taken a similar in-
terest in the cross.  Pub. L. 108–87, §§8121(a) and
(b), 117 Stat. 1100.

• The transfer was made "subject to the condition
that the recipient maintain the conveyed property
as a memorial," and the property reverts to the
United States if the Secretary determines that the
recipient has failed to do so.  §8121(e), *id.,* at 1100.

• After the transfer, the cross would sit on 1 acre of
privately owned land in a 1.6 million acre national
preserve, over 90% of which is federally owned.
212 F. Supp. 2d, at 1205.

• Congress had previously prevented the use of fed-
eral funds to remove the cross from its present lo-
cation.  Pub. L. 107–248, §8065(b), 116 Stat. 1551;
Pub. L. 106–554, §133, 114 Stat. 2763A–230.

The District Court considered the facts before it through
the lens of the injunction's original purpose.  See 364
F. Supp. 2d, at 1180 (explaining that the "[G]overnment's
continuing control over the Latin cross" and the involve-
ment of private parties who "desir[e] its continued pres-
ence in the Preserve," "demonstrat[e]" that the transfer
would not end "the [G]overnment's apparent endorsement
of a particular religion"); *id.,* at 1182 (considering the
historical context of the transfer statute); see also *Buono*
v. *Kempthorne,* 527 F. 3d 758, 783 (CA9 2008) ("carving
out a tiny parcel of property in the midst of this vast Pre-
serve . . . will do nothing to minimize the impermissible
governmental endorsement" perceived by the reasonable
observer).  And it concluded that the land transfer would
frustrate that purpose.  See 364 F. Supp. 2d, at 1182 (the
transfer would "keep the Latin cross atop Sunrise Rock
without actually curing the continuing Establishment

Clause violation"); see also 527 F. 3d, at 783 (finding that "[n]othing in the present posture of the case alters . . . earlier conclusions" regarding what a reasonable observer would perceive). In my view, this is a reasonable conclusion.

The injunction forbids the Government to permit the display of the cross on Sunrise Rock, and its basic purpose was to prevent a reasonable observer from believing that the Government had endorsed the cross. Under the circumstances presented to the District Court, the transfer would have resulted in such a display and might well have conveyed such a message. Consequently, the District Court's decision that the land transfer violated the injunction as written and intended was not an abuse of discretion. And that is what the Ninth Circuit properly held on appeal. What the Establishment Clause implications of the changed circumstances may be is a matter not before us. Cf. *Frew* v. *Hawkins*, 540 U. S. 431, 442 (2004) ("If the [enjoined defendant] establishes reason to modify the decree, the court should make the necessary changes; where it has not done so, however, the decree should be enforced according to its terms").

Because my conclusion rests primarily upon the law of injunctions, because that law is fairly clear, and because we cannot properly reach beyond that law to consider the underlying Establishment Clause and standing questions, I can find no federal question of general significance in this case. I believe we should not have granted the petition for certiorari. Having granted it, the Court should now dismiss the writ as improvidently granted. Since the Court has not done so, however, I believe that we should simply affirm the Ninth Circuit's judgment.

With respect, I dissent.